**HERBERT HARVEY, INC., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 22040.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 14, 1969.

Decided Sept. 19, 1969.

Before WRIGHT, McGOWAN and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

In what marks a reappearance of the controversy in this court, the petitioner, Herbert Harvey, Inc., renews its challenge to the National Labor Relations Board's assertion of jurisdiction over it as an employer of service and maintenance workers in buildings in the District of Columbia owned by the International Bank for Reconstruction and Development, commonly known as the World Bank. When the litigation was here previously, we reversed an order of the Board directing Harvey to bargain with the certified representative of those employees, and remanded the proceeding for determinations calculated to resolve the jurisdictional problem.[1] On remand, the Board rendered a supplemental decision [2] reaffirming its earlier decision,[3] and the case is back for further review. We are satisfied, after careful study of the record, that the Board did not err in assuming jurisdiction over Harvey, and the order to bargain will be enforced.

I.

The complexity of the jurisdictional issue prompts us to retrace the procedural history of the dispute as a preface to an expression of our reasons for sustaining the Board. Government Service Employees' Union, Local 536, Building Service Employees' International Union, AFL–CIO, petitioned the Board for an election to ascertain its status as bargaining representative of certain service and maintenance employees [4] in three buildings [5] housing the principal office of

Mr. Stanley R. Strauss, Washington, D. C., with whom Mr. Kenneth C. McGuiness, Washington, D. C., was on the brief, for petitioner.

Mr. Gary Green, Attorney, N. L. R. B., with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Mrs. Abigail Cooley Baskir, Attorney, N. L. R. B., were on the brief, for respondent.

1. Herbert Harvey, Inc. v. NLRB, 128 U.S. App.D.C. 162, 385 F.2d 684 (1967).

2. Herbert Harvey, Inc., 171 N.L.R.B., 1968–1 CCH NLRB ¶ 22,441 (1968).

3. Herbert Harvey, Inc., 162 N.L.R.B. 890 (1967).

4. The Board found that the unit appropriate for collective bargaining consisted of "[a]ll charwomen, porters, and ele-
vator operators * * * but excluding carpet layers, engineers, cafeteria employees, dining room employees, office clerical employees, guards, and supervisors. * * * " Id. at 893.

5. The employees at one of the four buildings in the World Bank complex were excluded from the bargaining unit by stipulation of the parties.

the World Bank at which Harvey, by contract with the Bank, manages the operation and maintenance. Harvey opposed the petition on the grounds that the Bank, and not Harvey, is the employer and that, in any event, the Bank is exempt from regulation by the Board and Harvey's relationship with the Bank is such that the Board should decline jurisdiction over Harvey.[6]

The Board, after a hearing, directed a representation election, finding that Harvey is "an employer" whose service and maintenance activities are "not so intimately connected with the purposes or operations of the World Bank as to warrant withholding the exercise of jurisdiction over the business of the Employer."[7] Harvey moved for reconsideration on averments that those findings are inconsistent with Board precedents, and that the Board had failed to determine the Bank's status as an employer. The motion was denied without opinion.

In the Board-conducted election, the Union amassed a majority, and the Board formally certified it as the exclusive bargaining representative of the employees. When Harvey subsequently refused to bargain, the Board's General Counsel issued an unfair labor practice complaint alleging that the refusal infringed provisions of the National Labor Relations Act.[8] The Board deemed the decisive question to be essentially that resolved in the representation proceeding, and perceived no triable issue requiring a hearing. Consequently, it awarded a summary judgment that Harvey had violated the Act as charged, and ordered Harvey to bargain with the Union upon its request.[9]

Harvey then petitioned this court to review and set aside the Board's decision and order, raising only the jurisdictional point, and the Board cross-petitioned for enforcement of the order. Commenting upon an apparent inconsistency between that decision and prior holdings of the Board,[10] we held that the Board had "erred in failing to find the Bank to be a joint employer with Harvey, in failing to make findings as to the Bank's status—whether exempt or not—and in failing to decide whether the Bank's status, if exempt, would require it to refuse to assert jurisdiction over Harvey."[11] We accordingly remanded the cause to the Board for further consideration in the light of our opinion.[12]

On remand, the Board issued a supplemental decision[13] reaffirming its prior decision and elucidating the basis upon which it predicated the bargaining order against Harvey. The World Bank, the Board held, enjoys immunity from its jurisdiction,[14] and our view that the Bank and Harvey are joint employers was accepted as the law of the case.[15] But, the Board held further, Harvey has sufficient control over the working conditions of the service and maintenance employees at the World Bank as to enable it to bargain effectively with the Union.[16] The Board also reviewed the previous decisions that had troubled us and, overruling one,[17] considered them to be compatible with the result achieved here.[18]

---

6. See note 25, *infra*, and accompanying text.

7. Herbert Harvey, Inc., 159 N.L.R.B. 254, 255 (1966).

8. §§ 8(a) (1), 8(a) (5), 29 U.S.C. §§ 158 (a) (1), 158(a) (5) (1964).

9. *Herbert Harvey, Inc., supra* note 3.

10. Herbert Harvey, Inc. v. NLRB, *supra* note 1, 128 U.S.App.D.C. at 164, 385 F.2d at 686.

11. *Id.*

12. *Id.* Judge McGowan concurred in this disposition for reasons stated in his separate opinion, 128 U.S.App.D.C. at 164–165, 385 F.2d at 686–687.

13. Herbert Harvey, Inc., *supra* note 2.

14. 1968–1 CCH NLRB ¶ 22,441 at 29,599.

15. *Id.* at 29,601.

16. *Id.*

17. See note 81, *infra*, and accompanying text.

18. Herbert Harvey, Inc., *supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,602–29,603.

The effect of the Board's supplemental decision is, of course, to reinstate its bargaining order.

The parties now return to this court, Harvey in an effort to annul the decision and the Board to obtain enforcement of the order. Harvey insists that the evidence shows that it is incapable of meaningful collective bargaining, and that the Board's assumption of jurisdiction is so much at war with Board precedents as to reach the point of administrative arbitrariness. To these and other facets of the Board's adjudication we now proceed.

## II.

Although the World Bank is not a target of the Board's bargaining order, the status of that institution, as we signified in our opinion preceding the remand,[19] bears vitally on the contest at hand. The Board, on remand, held that the Bank lay outside the ambit of the Act, and that holding Harvey readily accepts. The Board was influenced to that end by the Bank's genesis in an agreement ratified by many countries, its situation as a spe-

cialized agency of the United Nations, and the unique advantages it enjoys.[20] From these factors, "[i]t [was] manifest" to the Board "that the World Bank is an international organization which enjoys the privileges and immunities from the laws of the sovereignty in which it is located customarily extended to such organizations."[21] Recognizing that to sustain jurisdiction in the "delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed,"[22] the Board could "find nothing in the language of the statute or in its legislative history that would lead us to conclude that Congress intended the Board to exercise its jurisdiction over the operations of the World Bank."[23]

Like Harvey, we approve the Board's determination in this regard, but that determination is not the finale, but only the prelude. The Board, it seems patent, has statutory jurisdiction over Harvey, *qua* Harvey,[24] and Harvey does not urge the contrary. The Board, however, has traditionally reserved a discretion to decline

---

**19.** As we have stated, see the text *supra* at notes 10–11, we charged the Board "to make findings as to the Bank's status—whether exempt or not" and "to decide whether the Bank's status, if exempt, would require [the Board] to refuse to assert jurisdiction over Harvey." Herbert Harvey, Inc. v. NLRB, *supra* note 1, 128 U.S.App.D.C. at 164, 385 F.2d at 686.

**20.** "The World Bank was established in 1944 at a conference of 44 nations at Bretton Woods, New Hampshire. The agreement reached at the conference was subsequently accepted by 39 of the 44 participating nations. The agreement established the Bank as an intergovernmental institution, corporate in form, with all of its capital stock being owned by its member governments. In 1947 the Bank became a specialized agency of the United Nations. Under the agreement the Bank enjoys certain privileges and immunities. Thus the governors, directors, officers, and employees of the Bank are immune from legal process for acts performed in their official capacities, and, unless they are local nationals, they are to be accorded the same immunities from immigration restrictions, alien registration requirements, and national service obligations, and the same treatment in respect to travel facilities as are accorded offi-

cials of member governments. The archives of the Bank are inviolable and its assets immune from seizure, attachment or execution prior to delivery of final judgment against it. The Bank's official communications are to be accorded the same treatment accorded to official communications of other members." Herbert Harvey, Inc., *supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,600.

**21.** *Id.*

**22.** Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 147, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957). See also McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 18–22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963).

**23.** Herbert Harvey, Inc., *supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,-601.

**24.** The Board is empowered by the Act "to prevent any person from engaging in any unfair labor practice * * * affecting commerce." § 10(a), 29 U.S.C. § 160(a) (1964). The Act defines "affecting commerce" as meaning, *inter alia*, "having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." § 2(7), 29 U.S.C. § 152(7) (1964),

jurisdiction in particular cases where it believes the policies of the Act will not be effectuated by an exercise of its authority,[25] and Harvey does press for a declination. It may be expected that in the consideration and resolution of that contention in each of its argumentative aspects, the role of the World Bank will loom large.

### III.

■ The Board read our previous decision as holding that Harvey and the World Bank are joint employers of the workers in question.[26] And the Board felt that it must, as we feel that we should, take that holding as the law of the case.[27] The issue then arising before the Board, as it stated,[28] was whether, in this alliance of exempt and nonexempt employers, Harvey is vested with enough autonomy over the employment arrangements and working conditions to enable it to bargain efficaciously with the Union.[29] For Harvey is not required "to do

---

and "commerce" as including "trade, traffic, commerce, transportation, or communication * * * within the District of Columbia * * *," § 2(6), 29 U.S.C. § 152(6) (1964). Harvey supplies the World Bank with approximately 120 porters, charwomen and elevator operators, and derives about $100,000 annually from the operation. By our assessment, the Board was correct in treating the situation as one affecting commerce within the District, and so as one falling within the grant of statutory authority. Compare W. W. Chambers Co. v. NLRB, 108 U.S.App.D.C. 42, 279 F.2d 817, cert. denied, 364 U.S. 880, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960).

25. See the cases cited *infra* Part IV. Since 1950, the Board has observed self-devised standards governing its jurisdictional exertions in specified areas. See Guss v. Utah Labor Relations Bd., 353 U. S. 1, 3, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957); Leedom v. Fitch Sanitarium, Inc., 111 U.S.App.D.C. 55, 59–60, 294 F. 2d 251, 254 (1961). Throughout many years, the Board's practice endured without specific statutory authorization, or more than bare approval in principle by the Supreme Court. See NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 684, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). See also Building Trades Council v. Kinard Constr. Co., 346 U.S. 933, 74 S.Ct. 373, 98 L.Ed. 423 (1954); NLRB v. Indiana & Michigan Elec. Co., 318 U.S. 9, 18, 63 S.Ct. 394, 87 L.Ed. 579 (1943). As late as 1957, the Court noted that it "has never pased and we do not pass today upon the validity of any particular declination of jurisdiction by the Board or any set of jurisdictional standards." Guss v. Utah Labor Relations Bd., *supra*, 353 U.S. at 4, 77 S.Ct. at 599.

In 1959, however, after the decisions in Office Employes Union v. NLRB, 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957) and Local 255, Hotel Employees Local No. 255, Hotel and Restaurant Emp. and Bartenders Intern. Union v. Leedom, 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143 (1958), Congress added to the Act Section 14(c) (1), 29 U.S.C. § 164(c) (1) (1964), providing:

The Board, in its discretion, may, by rule of decision or by published rules adopted pursuant to the Administrative Procedure Act, decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction: *Provided*, That the Board shall not decline to assert jurisdiction over any labor dispute over which it would assert jurisdiction under the standards prevailing upon August 1, 1959.

For judicial constructions of that section, see McCulloch v. Sociedad Nacional de Marineros de Honduras, *supra* note 22, 372 U.S. at 20 n. 10, 83 S.Ct. 671; Hirsch v. McCulloch, 112 U.S.App.D.C. 348, 303 F.2d 208 (1962); Leedom v. Fitch Sanitarium, Inc., *supra*.

26. Herbert Harvey, Inc., *supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,601.

27. *Id.*

28. *Id.*

29. As we plainly indicated before, the fact that the Bank was exempt and shared in some degree the regulation of employment conditions would not ipso facto bar an assertion of jurisdiction over Harvey. Herbert Harvey, Inc. v. NLRB, *supra* note 1, 128 U.S.App.D.C. at 164, 385 F.2d at 686.

the impossible"[30] or to engage in "a mere 'exercise in futility;'"[31] rather, "the purpose of collective bargaining is to produce an agreement and not merely to engage in talk for the sake of going through the motions."[32] And "[t]he doing of a useless and futile thing is no more required in collective bargaining between an employer and a labor union than in other activities."[33]

■ On the record, the Board concluded, however, "that [Harvey] is fully capable of bargaining effectively with the Union regarding the wages, hours, and other conditions of employment of its employees."[34] In reaching that conclusion, the Board looked first to the contract[35] which for many years has particularized the rights and liabilities of the parties,[36] an initiation point it was free to select.[37] To the Board it was "plain that the contract * * * contemplated a completely independent relationship between the parties."[38] and to us an examination of the agreement discloses ample foundation for that interpretation.

The contract obligates Harvey to "furnish to the Bank complete operating and maintenance service" and to "provide and supervise all personnel necessary for" that service. As the Board emphasized, the contract states that Harvey affords the service "as an independent contractor," specifies that Harvey "will be solely responsible for the conduct of its employees," and binds Harvey to indemnify the Bank against liability or loss "arising out of the conduct of the Company" or "its employees."[39]

---

30. NLRB v. Grace Co., 184 F.2d 126, 130 (8th Cir. 1950), holding that enforcement of a bargaining order would be denied if the plant to which it related was permanently closed. But see Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965).

31. NLRB v. Winn-Dixie Stores, Inc., 361 F.2d 512, 517 (5th Cir.), cert. denied, 385 U.S. 935, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966), citing NLRB v. American Mfg. Co., 351 F.2d 74, 81 (5th Cir. 1965). In that case, enforcement of so much of an order as required bargaining over the reestablishment of a cheesecutting and prepackaging operation was refused because, on the evidence, the employer undoubtedly would refuse to reestablish the operation.

32. Westinghouse Elec. Corp. v. NLRB, 387 F.2d 542, 550 (4th Cir. en banc 1967). There an order requiring the employer to bargain with reference to prices charged for coffee in plant cafeterias operated by an independent contractor was refused because the matter was not a subject of mandatory bargaining and because the independent contractor, and not the employer, fixed the prices.

33. NLRB v. Florida Citrus Canners Cooperative, 288 F.2d 630, 632–633 (5th Cir. 1961), rev'd on other grounds, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962).

34. Herbert Harvey, Inc., supra note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,601.

35. The Board had earlier analyzed the contract in its decision following the representation hearing. Herbert Harvey, Inc., supra note 7, 159 N.L.R.B. at 254. We refer hereinafter to pertinent portions of that decision.

36. As the Board found, the contract was formulated in 1955, and was renewed annually with changes to accommodate the acquisition of new buildings and necessary adjustments as to reimbursement, discussed infra note 44. Id. at 254.

37. Compare Butler Bros. v. NLRB, 134 F.2d 981 (7th Cir. 1943), where the corporate owner of a building and a building maintenance company "occupied some sort of a dual capacity as employers," id. at 985, and it was held that "the Board was entitled to appraise [the contract] in connection with the circumstances which both preceded and followed its execution," id. at 984, in order to determine the extent to which each exercised dominion over maintenance employees.

38. Herbert Harvey, Inc., supra note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,601.

39. Id. at 29,601. The paragraph of the contract quoted in text reads as follows: It is understood and agreed that the Company (1) will perform the services to be rendered by it hereunder as an independent contractor, (2) will be solely responsible for the conduct of its employees, agents and servants, (3) and will hold the Bank harmless from any liability, loss or damage arising out

It was "obvious" to the Board, and upon a reasonable reading nearly so to us, that these stipulations were "intended to make clear that as between the" parties Harvey "was to be regarded as the Employer with primary responsibility over the employees performing services under the contract." [40] And since, as the Board pointed out, the contract does not elsewhere refer to the employees who are to perform the service, "there is no reservation of rights to the Bank to determine wage rates, to set hours of work, to discharge or hire, or otherwise to exercise authority over the conditions of employment of the employees." [41] That proposition draws support as well from the contractual provisions which specify the financial arrangements between the parties. The contract requires the Bank to compensate Harvey by a fixed monthly fee and to reimburse Harvey for all reasonable direct [42] costs, up to a stated monthly maximum,[43] of affording the service. Reimbursable costs include the wages paid and the benefits afforded the employees [44] and, as the Board states, the contract imposes no limitation on the wages Harvey pays the employees.[45]

In sum, it was the Board's overall estimate that "the contract discloses that the parties thereto intended that [Harvey] should assume complete control over the employees performing the maintenance services in the buildings occupied by the World Bank, subject only to the general [contractual] strictures * * * that the services by [Harvey] be rendered 'in an efficient, safe and business-like manner and * * * as economically as sound business judgment warrants' and * * * that the 'cost' of the services rendered by [Harvey] be 'reasonable' ".[46] With contractual stipulations of such clear import as those before us, we perceive no sound ground upon which we might disturb that construction.[47]

Harvey contends, very properly, that the inquiry must extend beyond the language of the contract to the evidence describing the parties' actual practice,

of the conduct of the Company, its employees, agents and servants.

40. *Id.*

41. *Id.*

42. See note 44, *infra.*

43. Expenditures exceeding the monthly maximum require the Bank's written approval.

44. The contract excludes from reimbursable costs only "overhead, bookkeeping and similar expenses." In its decision in the representation proceeding, the Board summarized the principal features of the cost-plus-fixed-fee arrangement thusly:

Reimbursable costs include both labor and supplies. Supplies are ordered under the Bank's tax exemption certificate and paid for by the Employer out of an advance received from the Bank. The Employer obtains prior approval of the Bank for large purchases of expendable items. All supplies and materials purchased become the property of the Bank. The Employer pays the employees' wages, sick leave, and vacation pay out of the advance from the Bank. Group hospitalization and workmen's compensation are likewise paid out of this advance. The Employer makes the employer's contribution to the social security system and is reimbursed by the Bank for this expenditure.

The Employer makes all the usual deductions from its employees' pay such as withholding income tax and the employees' contribution to the social security system. Its employees are subject to the District of Columbia Minimum Wage and Safety Regulations. They share none of the immunities from local and national law enjoyed by employees of the World Bank.

Herbert Harvey, Inc., *supra* note 7, 159 N.L.R.B. at 254–255.

45. Herbert Harvey, Inc., *supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,601.

46. *Id.*

47. The contractual stipulation that "the Bank may from time to time upon reasonable notice to the Company itself perform or otherwise procure the performance of particular services to be rendered by the Company hereunder" does not, in our view, derogate from Harvey's own authority over the employees performing the services it does provide. The same may be said for the provisions entitling the Bank to terminate the contract in the event that Harvey's performance becomes "substantially impaired."

and that the evidence demonstrates Harvey's impotency at the bargaining table. But the Board did consider the parties' relationship as revealed by the evidence, and in its light, as well as that shed by the contract, it found that Harvey is able to engage in meaningful collective bargaining. We ourselves have scrutinized the factors upon which the Board relied and the evidence upon which they were based, and conclude that the result reached by the Board is well supported.

The Board found that the hiring of employees to perform the work required by the contract fell primarily within Harvey's sphere, and so the evidence discloses. With occasional departures in procedure, Harvey receives the applications for appointment, reviews the applicants' references, and makes the decisions on employment, clearing with the Bank if there is doubt as to an applicant's acceptability.[48] Hiring is a constant activity, since absenteeism runs exceedingly high and replacements for the work force are a daily need.[49] Ordinarily, if a prospective employee has a normal reference on former employment and a clear police record, he is engaged to fill any vacancy existing.[50] And while Harvey does not, as a matter of practice, discharge employees without consultation with the Bank,[51] the testimony suggests that the practice is designed to avoid displeasing the Bank.[52]

Supervision of the employees' work, the Board also found, is Harvey's responsibility,[53] and again the evidence sustains the Board's finding. Harvey maintains on-the-job supervisors who direct the details of the work done by both the day and night crews. The daytime supervisor, during the course of his daily contacts, frequently receives instructions from Bank officials, and these are passed on to the employees; sometimes a direction as to the work is given an employee directly.[54] In the main, however, there is close observance of the contract provisions investing Harvey with control over the employees and disclaiming any

---

48. "Applications for employment are made on forms provided by the Employer. The Employer's two supervisors check the applicant's references and, unless there is some matter in the application that appears to be subject to question, they hire the applicant if the applicant is qualified and needed. The application form is then forwarded to the Employer's executive vice-president, who may check anything unusual she finds in the application. If necessary, as in cases where there may be doubt as to the acceptability of the applicant to the Bank, the executive vice-president obtains clearance for such hiring from the Bank. On occasion, officials of the Bank have recommended persons for employment and such persons have been put immediately on the payroll by the Employer without the usual prehiring checks." Herbert Harvey, Inc., *supra* note 7, 159 N.L.R.B. at 255.

49. The turnover rate is three to five workers per day.

50. As to the standards for selection imposed by the Bank, the only requirement specifically mentioned by Harvey's executive vice-president is that the applicant have a clear police record. "If there is any charge at all," she testified. " * * * I am not allowed to hire them unless [the Bank] approves it, * * * [I]f there is a real question * * *, I wouldn't hire them without clearing it first with [the Bank]."

51. "Discharges are recommended by the supervisors and effectuated only after review both by the Employer's executive vice-president and by the Bank. Discharges recommended by the Bank are carried out without any review or check." Herbert Harvey, Inc., *supra* note 7, 159 N.L.R.B. at 255.

52. The record shows that Harvey's officials "have *to be very careful* about discharges" of unsatisfactory employees for the reason that "the floor that he *works on might have a* V.I.P. *who can't* care less what [Harvey] did or not, and he liked him, and [Harvey] would have *to keep* him."

53. Herbert Harvey, Inc., *supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 22,601.

54. "The work of the employees in the unit is directed by the Employer's two supervisors. Instructions from the Bank are normally transmitted to the employees through the supervisors although Bank officials may, on occasion, instruct an employee directly." Herbert Harvey, Inc., *supra* note 7, 159 N.L.R.B. at 255.

duty upon the Bank relative to their performance.

The Board recognized that the Bank has to some extent participated in the hiring and firing of employees.[55] It acknowledged that the Bank approves promotions and year-end wage increases but saw from the evidence that the Bank routinely agrees to them.[56] But despite so much of an interlinking relationship between the Bank and Harvey over the employees, the Board found that primary control of the employees was vested by the contract in Harvey and was actually exercised by Harvey. In the Board's judgment, "[s]o far as the record reveals, the extent of [Harvey's] acquiescence in the World Bank's participation in the hiring, discharge, and assignment of employees was no more than that which any service company would permit in order to please its clients,[57] and the World Bank's participation in promotions and the setting of wage scales was no more than an exercise of its right to police the costs being incurred under the contract."[58] "Indeed," the Board observed, "for the World Bank to have participated to any great degree in the employment conditions of the employees would be to interfere with [Harvey's] obligation to obtain and retain the competent employees necessary to render the efficient and economical service which it was hired to provide under the contract with the World Bank."[59] Thus the Board was led to "conclude that [Harvey] exercises effective control over the working conditions of its employees and is fully competent to bargain with the Union in accordance with the provisions of the Act."[60]

Undoubtedly, the cost-plus-fixed-fee method of reimbursing and compensating Harvey gives the World Bank some control—in the form of cost ceilings periodically agreed to by the parties—over monetary rewards to the employees, but in no greater measure than in other instances where that arrangement is a contractual feature. Indeed, as we have stated, the Bank usually approves promotions and annual wage increases requested by Harvey. Moreover, cost-plus-fixed-fee contracts are in widespread use, not only in private industry but also in business with the Federal Government.[61] The Board exerts its jurisdiction over Government cost-plus-fixed-fee contractors,[62] and we perceive no reason why it cannot.[63] The paramount question is whether enough authority over labor relations is lodged in such a contractor to enable a satisfaction of bargaining obligations under the Act, and we believe that in the case at bar there was.

■ The evidence sustains the Board's finding that Harvey is able to bargain effectively in the areas of prospective negotiation—hiring, firing, promotions, wages, benefits and other conditions of employment. True it is that

55. Herbert Harvey, Inc., *supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,601.

56. "It is also true that the World Bank approves year-end raises for the employees, although it is also plain from the record that such raises are routinely agreed to by the Bank. And even though [Harvey's] vice-president testified that many requests for promotions have been rejected, she could not recall the last time that such a request had been refused." *Id.* at 29,601.

57. Compare NLRB v. Howard Johnson Co., 317 F.2d 1, 3 (3d Cir.), cert. denied, 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164 (1963).

58. Herbert Harvey, Inc., *supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,601.

59. *Id.* at 29,601.

60. *Id.* at 29,601–29,602.

61. See, *e. g.*, Powell v. United States Cartridge Co., 339 U.S. 497, 499 n. 2, 70 S.Ct. 755, 94 L.Ed. 1017 (1950).

62. *E. g.*, American Smelting & Ref. Co., 92 N.L.R.B. 1451, 1452 (1951).

63. Indeed, to conclude otherwise is to remove this large and important group of contractors from the operation of the Act, a feat Congress hardly intended to make possible.

Harvey, like many—perhaps most [64]—other employers, may face practical limitations in some of these areas but, as the evidence denotes and the Board found, not in sufficient degree to frustrate bargaining efforts. The process of collective bargaining, we are instructed, may appropriately be invoked although the employer is subject to rather substantial handicaps. In NLRB v. E. C. Adkins & Company,[65] the Supreme Court held that guards at a plant producing military materials were Adkins' "employees" [66] although they were required to be civilian auxiliaries to the Army's military police, and although the Army had power to veto the hiring or firing of any guard and to take corrective action through management to safeguard the caliber of plant protection. The Court sustained the Board's determination that Adkins had "a sufficient residual measure of control over the terms and conditions of employment of the guards" to permit their treatment as employees; [67] "it matters not," said the Court, "that [Adkins] was deprived of some of the usual powers of an employer, such as the absolute power to hire and fire the guards and the absolute power to control their physical activities in the performance of their service. Those are relevant but not exclusive indicia of employer-employee relationship under [the Act]." [68] The Court accordingly sustained the Board's order requiring Adkins to bargain with the guards' representative.[69]

A conclusion that one joint employer has the dominant role in setting the conditions of employment depends upon the relative weight to be credited to the individual factors having pertinence. Here the Board weighed the factors—derived from the parties' contract and their actual practices—and found that Harvey had sufficient command of employment conditions to enable efficacious bargaining with the Union. What the Board faced was "essentially a factual issue," [70] the Board's resolution of which is conclusive upon us unless unsupported by substantial evidence on the record considered as a whole,[71] or unless arbitrary or capricious.[72]

Beyond that, the Board's task in this case was reconciliation of the benefits conferred by the Act with the immunities enjoyed by the World Bank, a task not fundamentally unlike others that have been thrust upon the Board before.[73] The record reflects the Board's appreciation of the competing considerations inhering in the situation and its conscientious endeavor to effect a sensible accommodation. We think "[t]he responsibility of representing the public interest in such matters and of reaching a judgment after giving due weight to all the relevant factors lay primarily with the Board." [74] We think, too, that "[i]n

64. Absolute freedom to regulate the rewards and conditions of employment is perhaps a relatively scarce commodity, for adjustments as to either will ordinarily be reflected in the market price for the employer's product or service.

65. 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947).

66. Within the definition of the Act, § 2(3), 29 U.S.C. § 152(3) (1964).

67. 331 U.S. at 412, 67 S.Ct. at 1273.

68. Id. at 413, 67 S.Ct. at 1273.

69. See also NLRB v. Carroll, 120 F.2d 457 (1st Cir. 1941) ; NLRB v. Howard Johnson Co., supra note 57, 317 F.2d at 3.

70. Boire v. Greyhound Corp., 376 U.S. 473, 481, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).

71. National Labor Relations Act, § 10, 29 U.S.C. § 160 (1964).

72. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 797, 798, 65 S.Ct. 982, 89 L.Ed. 1372 (1945) ; NLRB v. Hearst Publications, 322 U.S. 111, 130–131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

73. Compare the cases treating independent contractors with statutorily exempted and policy exempted organizations, infra Part IV.

74. NLRB v. E. C. Adkins & Co., supra note 65, 331 U.S. at 414, 67 S.Ct. at 1274. There the Court spoke to the Board's "reconciliation of the rights guaranteed by the Act with the important wartime duties of plant protection employees," id., a problem quite analogous to the one the Board faced here.

the absence of some compelling evidence that the Board has failed to measure up to its responsibility, courts should be reluctant to overturn the considered judgment of the Board and to substitute their own ideas of the public interest." [75] We uphold the Board in its determination that Harvey is amply endowed to bargain effectively with the Union.

## IV.

While, to be sure, the Board has broad discretion to determine when a jurisdictional exercise will serve the objectives of the Act,[76] its power is not unlimited, and is never to be used dogmatically.[77] As we recently noted in another instance where the Board's action departed substantially from that taken in seemingly like cases, "the Board cannot act arbitrarily nor can it treat similar situations in dissimilar ways. The Board has a responsibility to administer the Act fairly and rationally." [78]

This admonition brings us to the question whether the Board's assertion of jurisdiction over Harvey was so inconsistent with its precedents as to constitute arbitrary treatment amounting to an abuse of discretion.

When the litigation was here before, we called attention to an apparent incongruity, "totally unexplained," [79] between the Board's adjudication in this case and those it had made in four cases involving nonexempt suppliers of food services to exempt institutions.[80] On remand, the Board reexamined the cases we identified and, overruling one,[81] felt that its decision in the litigation at bar was in keeping with the remaining three.[82] At Harvey's insistence, we now reexamine those holdings to ascertain the degree to which that might be so.

In two of the three decisions the Board left standing, food services were furnished to educational institutions [83] and

---

75. *Id.*

76. See the cases cited *supra* note 25 and *infra* note 93.

77. See Local 11, Office Employes Union v. NLRB, *supra* note 25, 353 U.S. at 320, 77 S.Ct. 799; Local 255, Hotel Employees Local No. 255, Hotel and Restaurant Emp. and Bartenders Intern. Union v. Leedom, *supra* note 25; Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America AFL v. NLRB (Charleston Transit Co.), 99 U.S.App.D.C. 177, 179, 238 F.2d 38, 40 (1956); Pedersen v. NLRB, 234 F.2d 417, 419 (2d Cir. 1956); NLRB v. Gene Compton's Corp., 262 F.2d 653, 655 (9th Cir. 1959).

78. Burinskas v. NLRB, 123 U.S.App.D.C. 143, 148, 357 F.2d 822, 827 (1966). See also Melody Music, Inc. v. FCC, 120 U.S.App.D.C. 241, 243–244, 345 F.2d 730, 732–733 (1965).

79. Herbert Harvey, Inc. v. NLRB, *supra* note 1, 128 U.S.App.D.C. at 164, 385 F.2d at 686.

80. *Id.* The cases we specified were Crotty Bros., 146 N.L.R.B. 755 (1964); Prophet Co., 150 N.L.R.B. 1559 (1965); Horn & Hardart Co., 154 N.L.R.B. 1368 (1965); and Specialized Maintenance Servs., Inc., No. 22–RM–222 (NLRB March 7, 1966), all hereinafter discussed.

81. *Specialized Maintenance Servs., Inc., supra* note 80.

82. *Herbert Harvey, Inc., supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,603.

83. In *Crotty Bros., Inc., supra* note 80, an independent supplier of food service management contracted to provide Trinity College, a nonprofit educational institution, with food service on a cost-plus-fixed-fee basis. The operation, paid for out of Trinity's budget, provided eating facilities for resident students, faculty and administrators. Trinity furnished and maintained the facilities and equipment, and shared with the contractor the control over the budget and labor relations. There was no opportunity for the contractor to profit from the operations. There was no other place within a mile of Trinity's campus at which food could be obtained. Because of the relationship of the food services to Trinity's educational program, the Board declined jurisdiction.
 Similarly, in *Prophet Co., supra* note 80, an independent contractor provided food services to Whitewater State University, a nonprofit state-operated institution, in facilities for students, faculty, staff and alumni. The contractor received a fixed fee for every student enrolled in the university's board plan and a percentage of cash sales it made. The university supplied all fixed equipment, and retained considerable supervisory con-

in the third to a hospital,[34] and in each the Board declined jurisdiction. In its supplemental decision herein, the Board distinguished this triology on the basis of an interconnection, which it found in the three cases, of the services supplied and the institution's noncommercial activities that gave rise to its exemption. The Board explained: [85]

> [T]he assertion of jurisdiction over a contractor providing services for an institution exempted from the process of the Act is dependent upon the relationship of the services performed to the exempted functions of the institution. Where the services are intimately connected with the exempted operations of the institution, the Board has found that the contractor shares the exemption; on the other hand,

where the services are not essential to such operations the Board has found that the contractor is not exempt and asserts jurisdiction over the contractor's activities. By so doing the Board is enabled to strike a balance between the Congressional policy of excluding the noncommercial charitable and educational activities of the institution [86] and the policy of the statute to encourage collective bargaining—one of the fundamental purposes of the Act.[87]

The Board has consistently applied this rationale of distinction in a number of cases besides those comprising the triology.[88] And not only have these applications resulted in declinations of jurisdiction in some cases but also in assumptions of jurisdiction in others.[89]

---

trol over the operation. No comparable facilities were available within a reasonable distance of the campus. Following *Crotty*, the Board declined jurisdiction.

In *Specialized Maintenance Servs., Inc.*, *supra* note 80, the Board declined jurisdiction over a contractor furnishing service and maintenance employees at Seton Hall University. The Board, in its supplemental decision, was unable to address the apparent conflict with *Crotty Bros.* and *Prophet Co.* because no record had been made in *Specialized Maintenance*. Herbert Harvey, Inc., *supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,603. Instead, it overruled *Specialized Maintenance* to the extent that it might be regarded as conflicting with its decision herein or in other cases. *Id.* Compare NLRB v. Baltimore Transit Co., 140 F. 2d 51, 54–55 (4th Cir.), cert. denied, 321 U.S. 795, 64 S.Ct. 848, 88 L.Ed. 1084 (1944).

84. In *Horn & Hardart Co.*, *supra* note 80, an independent contractor provided a food service operation for a nonprofit hospital. The hospital prepared all menus for the patients, supervised the preparation and nutritive contents of the food served them, and decided the times at which their meals would be served. The operation included principally a cafeteria for hospital employees, a coffee shop for hospital visitors, and a dining room for hospital faculty. The contractor's employees were required to meet the hospital's standards as to sanitation and clothing, and were subject to direction by the hospital staff in the performance of their duties. The

Board declined jurisdiction because of the connection the food service operation bore to the patient care and medical education purposes of the hospital.

85. Herbert Harvey, Inc., *supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,602.

86. Citing Trustees of Columbia University, 97 N.L.R.B. 424, 427 (1951).

87. Citing Woods Hole Oceanographic Institution, 143 N.L.R.B. 568, 574 (1963).

88. For example, the Board, since 1950, has declined jurisdiction over racetracks because of their essentially local nature and extensive local regulation, actual or potential, *e. g.*, Hialeah Race Course, Inc., 125 N.L.R.B. 388 (1959), Los Angeles Turf Club, Inc., 90 N.L.R.B. 20 (1950), and, in the application of the "intimately connected" test, has likewise declined jurisdiction over independent employers and activities closely related to the functioning of the racetrack operation. *E. g.*, Local 343, Hotel Employees Union (Resort Concessions), 148 N.L.R.B. 208, 213–214 (1964) (food and beverage concessions); Walter A. Kelley, 139 N.L. R.B. 744, 746–747 (1962) (horse owners and trainers employing grooms and exercise boys); William A. Dixon, 130 N.L. R.B. 1204, 1207 (1961) (public horse trainer); Meadow Stud, Inc., 130 N.L. R.B. 1202, 1203–1204 (1961) (horse owner and breeder); Pinkerton's Nat'l Detective Agency, Inc., 114 N.L.R.B. 1363, 1364 (1955) (employer of track guards). See also the cases cited *infra* note 89.

89. See, *e. g.*, where jurisdiction was declined, Massachusetts Institute of Tech-

What stands out in the Board's decisions is careful analysis and appraisal of the facts in individual cases in order to determine whether its "intimately connected" test leads to the one result or the other.[90] And so it was that the Board concluded that the services Harvey supplies were not so related to the functions of the World Bank as to warrant a withholding of jurisdiction:[91]

> The World Bank is an international investment institution engaged in making or guaranteeing loans for productive reconstruction and development projects in the territories of its members. The Bank supplements its investment activities by providing technical assistance of various kinds to underdeveloped member countries. [Harvey's] employees are engaged exclusively in the operation and maintenance of the buildings in which the World Bank is located. These housekeeping duties performed by [Harvey's] employees have no connection with the functions of the World Bank as an investment institution.[92]

Numerous cases attest the broad scope of the Board's discretion in determining whether an abstention from jurisdiction is likely to promote the objectives of the Act.[93] "The extent to which the Board

nology (Computation Center), 152 N.L.R.B. 598, 602–603 (1965) (research facility jointly operated by educational institution and business concern). Compare University of Miami (Institute of Marine Science Div.), 146 N.L.R.B. 1448, 1450 (1964) (research facility performing incidental services for outsiders). And see the cases cited *supra* note 88. See also, where jurisdiction was asserted, *e. g.*, Richmond of New Jersey, Inc., 168 N.L.R.B., 1968–1 CCH NLRB ¶ 21,979 at 28,884 (1967) (supplier of maintenance services to hospital); Bay Ran Maintenance Corp., 161 N.L.R.B. 820, 822 (1966) (same).

We note, too, that the Board's "intimately connected" test is utilized to determine whether jurisdiction will be asserted over eleemosynary institutions themselves. Where the institution's activities are noncommercial in nature and "intimately connected" with its charitable purposes and activities, jurisdiction is declined. See, *e. g.*, Young Men's Christian Ass'n, 146 N.L.R.B. 20, 22 (1964) (community service organization); Trustees of Columbia University, *supra* note 86, 97 N.L.R.B. at 426, 427 (libraries of educational institution). On the other hand, where the institution's activities are commercial in character or are not "intimately connected" with its charitable functions, jurisdiction is asserted. See, *e. g.*, Woods Hole Oceanographic Institution, *supra* note 87, 143 N.L.R.B. at 572–573 (research exclusively for Federal Government); Massachusetts Labor Relations Comm'n (Massachusetts Hospital Serv., Inc.), 138 N.L.R.B. 1329, 1331 (1962) (health and accident insurance services).

90. The Board's rationale is not whether the activity under scrutiny is essential to the functioning of the exempted operation but whether it is an integral attribute of that operation. Thus in Richmond of New Jersey, Inc., *supra* note 89, 1968–1 CCH NLRB ¶ 21,979 at 28,884, the Board stated that "on the basis of the whole record, it must be concluded that the services rendered to the hospital by the employer were not so integrated and interwoven with the purposes and operations of the hospital as to warrant the Board withholding jurisdiction over the employer also. * * * The fact that the employer's operations are necessary and essential to the functioning of the hospital, that they add to the comfort and convenience of patients, and that some of them are subject to review and approval of the hospital do not dictate a different conclusion in this case." See also Local 343, Hotel Employees Union (Resort Concessions), *supra* note 88, 148 N.L.R.B. at 214.

91. It was by an application of the "intimately connected" standard that the Board, from the very beginning, has insisted that its jurisdiction is appropriately exercised over Harvey. In its first decision—in the representation proceeding—the Board concluded "that the maintenance and service activities of [Harvey] are not so intimately connected with the purposes or operations of the World Bank as to warrant withholding the exercise of jurisdiction over the business of [Harvey]." Herbert Harvey, Inc., *supra* note 7, 159 N.L.R.B. at 255.

92. Herbert Harvey, Inc., *supra* note 2, 1968–1 CCH NLRB ¶ 22,441 at 29,603.

93. Amalgamated Association of Street Electric Railway and Motor Coach Employees of America AFL v. NLRB (Charleston Transit Co.), *supra* note 77, 99 U.S.App.D.C. at 178–179, 238 F.2d

chooses to exercise its statutory jurisdiction," the Fifth Circuit aptly warns, "is a matter of administrative policy within the Board's discretion, and in the absence of extraordinary circumstances whether jurisdiction should be exercised is for the Board, not the courts, to determine." [94] In situations wherein nonexempt contractors deal with exempt organizations, the Board has drawn the line of demarcation between its jurisdictional assertions and non-assertions so as to separate activities that are "intimately connected" with the exempted functions from those that are not. Not only does this distinction strike us as rational but we also recognize the need for indulging some leeway in its application. Administrators, no less than judges, may differ in their views on the same subjects without becoming arbitrary—even in their views as to whether two not unlike subjects require similar or dissimilar treatment.[95] Certainly when the administrative determination on that score stays within the zone of reasonableness, we are not at liberty to upset it simply because another determination might also be logical.[96] We do not find in the Board's holding in this case such a departure from its holdings in other cases resembling it as to support Harvey's claim of arbitrariness.[97]

The petition to review is denied. The Board's cross-petition for enforcement of its order is granted.

So ordered.

---

at 39-40; Pedersen v. NLRB, *supra* note 77, 234 F.2d at 419; NLRB v. WGOK, 384 F.2d 500, 502 (5th Cir. 1967); NLRB v. Harrah's Club, 362 F.2d 425, 427 (9th Cir. 1966), cert. denied, 386 U.S. 915, 87 S.Ct. 859, 17 L.Ed.2d 788 (1967); NLRB v. Southwestern Colorado Contractors Ass'n, 379 F.2d 360, 362 (10th Cir. 1967).

94. NLRB v. WGOK, *supra* note 93, 384 F.2d at 502.

95. Pinellas Broadcasting Co. v. FCC, 97 U.S.App.D.C. 236, 238, 230 F.2d 204, 206, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956).

96. United States v. Carmack, 329 U.S. 230, 243-246, 67 S.Ct. 252, 91 L.Ed. 209 (1946); Urmston v. City of North College Hill, 114 Ohio App. 213, 175 N.E.2d 203, 206, appeal dismissed, 172 Ohio St. 426, 178 N.E.2d 36 (1961); Milwaukie Co. of Jehovah's Witnesses v. Mullen, 214 Or. 281, 330 P.2d 5, 12, 74 A.L.R.2d 347 (1958), appeal dismissed and cert. denied, 359 U.S. 436, 79 S.Ct. 940, 3 L.Ed.2d 932 (1959); Wagoner v. City of Arlington, 345 S.W.2d 759, 764 (Tex.Civ.App.1961); Petition of City of Bellevue, 62 Wash.2d 458, 383 P.2d 286, 288 (1963).

97. Compare NLRB v. Harrah's Club, *supra* note 93; NLRB v. Gene Compton's Corp., *supra* note 77.