## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## POPE MAINTENANCE CORPORATION, Respondent.

### No. 77–1826.

United States Court of Appeals, Fifth Circuit.

May 26, 1978.

**900**

Elliott Moore, Deputy Associate Gen. Counsel, Michael Winer, Supervisor, Jessie Etelson, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. counsel, N.L.R.B., Washington, D. C., for petitioner.

John M. Capron, Atlanta, Ga., for respondent.

Before HILL, RUBIN and VANCE, Circuit Judges.

VANCE, Circuit Judge.

This case is before us on application of the National Labor Relations Board filed pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 151, *et seq.*, for enforcement of the board's order issued on February 22, 1977.[1] By such order the board affirmed the rulings, findings and conclusions of the administrative law judge and adopted his recommended order.

---

1. The board's Decision, Order and Direction is reported at 228 N.L.R.B. No. 20. (February 22, 1977).

It thereby found that Pope Maintenance Corporation violated sections 8(a)(1), (3) and (5) of the act, issued a bargaining order, and ordered reinstatement of unfair labor practice strikers with back pay. We find that the board's order should be enforced.

Pope Maintenance Corporation (the Company) is a Georgia corporation engaged in the maintenance and repair of aerospace ground equipment for the United States Air Force at Robins Air Force Base. The contract governing the work performed by the Company was between the air force and the Small Business Administration (SBA). SBA subcontracted the entire contract to the Company by what is referred to as an "8(A) subcontract," an arrangement to help disadvantaged persons secure a place in the business world.[2]

Under the contract the Company has the responsibility for repair of aerospace ground equipment used by the air force in the maintenance of aircraft. All parts and supplies for work on such equipment are either provided by the air force or are purchased by the Company for the air force with reimbursement by the air force to the Company. The air force supplies some of the physical facilities and certain heavy equipment.[3] The Company supplies most of the tools, some rolling stock and an off-base office and garage facility at its own expense.

The Company employs approximately 106 employees exclusive of supervisory and clerical personnel. Approximately half the work force are employed in what the contract refers to as "Category C." Employees in that category are responsible for moving equipment on and off the flight line and transporting it to the repair shops. Category C is also responsible for moving parts and supplies handled by the Company from one place to another.

Local 1063 of the Retail Clerks International (the Union) began organizational efforts in September 1975. On October 4, 1975 Union representatives met with Johnny Pope and demanded recognition on the basis of authorization cards signed by a majority of employees. Mr. Pope responded that he would talk with his associates and meet again the following week. On October 6 the Company's attorney contacted the Union representative and refused recognition. The Union representative told him that unless Mr. Pope responded to the demand promptly, he "might count [a union] majority on the street." On October 7, 1975 the Company's attorney sent a telegram to the Union confirming the Company's refusal to recognize the Union.

On November 12, 1975 the Union petitioned the board seeking an election which was held on January 6, 1976 and resulted in a 40 to 40 tie, with 1 void ballot and 56 challenged ballots.

The Union filed five separate charges alleging that the Company violated sections 8(a)(1), (3) and (5) of the act. The cases were consolidated for hearing. In adopting the findings of the administrative law judge, the board found that the Company violated 8(a)(1)[4] of the act by coercively interrogating its employees concerning their and other employees' union activities; by threatening employees with discharge, more stringent enforcement of company rules, cancellation of their vacations, loss of benefits and that the Company would cease operations if the Union were selected; by soliciting employees to sign a petition to withdraw their union cards; by creating the impression of surveillance of employee union activities; and by telling employees that it had a list of union supporters and

---

**2.** The Company is owned by Johnny Pope who qualifies for such a contract because he is part Cherokee.

**3.** Section VI of the contract provides that the government will furnish work facilities consisting of space in several portable metal buildings and that the Company will be assigned 5 tractors and 5 tugs.

**4.** Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) provides: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."

card signers and that it knew which employees had signed authorization cards. The board found that the Company violated 8(a)(1) and (3) [5] of the act by issuing written warning slips to four of its employees and by failing and by refusing to reinstate the unfair labor practice strikers applying for reinstatement. The Company was found to have violated 8(a)(5) [6] and (1) of the act by failing and refusing to bargain collectively with the Union.

The board ordered the Company to cease and desist from such unfair labor practices and from in any manner interfering with, restraining or coercing employees in the exercise of their section 7 rights, to reinstate the unfair labor practice strikers and make them whole, to expunge from its records the warning slips issued in violation of the act, to post appropriate notices and to bargain with the Union.

## JURISDICTION

At the outset we are faced with a jurisdictional issue. The Company urges that it is not an "employer" within the meaning of the act because it is so totally controlled by the SBA and the air force that it cannot engage in meaningful collective bargaining. In addition, the Company asserts that its operations are governmental in nature and are so intimately related to the mission of the United States Air Force as to share its statutory exemption.[7]

■ The act does not require an employer to engage in an exercise of futility and jurisdiction of the board is to be declined if the employer does not retain sufficient control over the employment relationship to engage in meaningful collective bargaining. *Compton v. Nat. Maritime U. of America, AFL–CIO,* 533 F.2d 1270 (1st Cir. 1976); *Herbert Harvey, Inc. v. NLRB,* 137 U.S. App.D.C. 282, 424 F.2d 770 (1969). It is the duty of the board in the first instance to determine who is a statutory employer for the purposes of the act and its determination "must be accepted by reviewing courts if it has a reasonable basis in the evidence and is not inconsistent with the law." *NLRB v. E. C. Atkins & Co.,* 331 U.S. 398, 403, 67 S.Ct. 1265, 1268, 91 L.Ed. 1563 (1947). Here the board determined that the Company has considerable freedom to negotiate concerning most of the terms and conditions of employment commonly found in labor-management contracts. We agree.

There is no restriction imposed either by the air force or by SBA on the Company's determination of wages or benefits. Like other federal contractors, the Company is subject to the Service Contract Act [8] and must meet certain minimum standards regarding holidays, vacations, benefits and wages. Above those minimums, however, the Company is free to establish its own rates and standards. The evidence shows that some employees work on an incentive basis earning from $14,000 to $20,000 annually, while others work on a straight hourly basis. In addition, persons with the same job titles are not always paid the same rates.

**5.** Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) provides: "It shall be an unfair labor practice for an employer—(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

**6.** Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5) provides: "It shall be an unfair labor practice for an employer—(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 158(a) of this title."

**7.** Section 152. Definitions. "When used in this subchapter—"(2) The term 'employer' . .

shall not include the United States . . . ." 29 U.S.C. § 152.

**8.** 41 U.S.C. § 351, *et seq.*

The Department of Labor publishes a register of wage determination establishing minimums for the general locality where the service is performed. The 1975 minimums for this locality were as follows:
1. $.16 an hour for health and welfare.
2. 1 week vacation after 1 year service, 2 weeks after 3 years of service.
3. 6 paid holidays per year.
4. The minimum hourly wages ranged from $3.96 to $5.52.

The Company says, however, that its potential profit is so restricted by the contract that there is no realistic range within which to bargain with the Union. It is true that it cannot immediately pass on to the air force any increased cost that may result from bargaining. The Company is paid at a fixed hourly unit price for work performed. Up to 80% of the work performed is so standardized that a set number of hours has been established for each job. The remaining 20% of the work is negotiated on a job-by-job basis. As noted by the board, this method of compensation gives the Company greater flexibility than the cost-plus-fixed-fee method.[9] By increasing efficiency the Company directly increases profits. The fact that 20% of the work is negotiated on a daily basis gives the Company an even greater chance to increase profits.

The air force requires that the work shifts of company employees be the same as the aircraft repair branch but the Company determines individual work schedules. Breaks and lunch periods are required to coincide with those of government personnel but in reality they are determined by the arrival of a refreshment truck. The air force dictates the exact number of employees who work in "Category C" both by classification and shift. Otherwise, the contract only specifies a representative number and classification of personnel for daily maintenance.[10]

The hiring of employees is essentially controlled by the Company. The contract does state that persons with questionable backgrounds shall not be employed and that the Company's personnel records may be reviewed by the air force. There is also a provision that company employees may be subject to a security check. The only required qualifications involve minimum experience criteria and the requirement that vehicle operators have appropriate drivers' licenses.

The Company directs its employees on a daily basis in the performance of their work. Supervision of the details of the work done is conducted by company supervisors. The board noted that in one instance the air force required that the Company increase the number of employees on the job when the work was falling behind schedule. There is no other evidence of any employee performance evaluation by the air force.

We find no significant limitations imposed by either the SBA or the air force on other matters commonly the subject of labor negotiations: seniority, grievance procedures, sick leave, retirement plans, profit sharing plans, health insurance plans, and merit pay increases.

"The process of collective bargaining . . . may appropriately be invoked although the employer is subject to rather substantial handicaps." *Herbert Harvey, supra,* 137 U.S.App.D.C. at 291, 424 F.2d at 779. The board went to great lengths to distinguish the Company's position from the position of the employer in *Teledyne Economic Development Company,* 223 N.L.R.B. 1040 (1976). In *Teledyne* the board isolated eighteen factors which convinced the panel majority that the employer was left with too little scope to enable it to bargain collectively within the meaning of the act. After careful consideration of the *Teledyne* case, the board found that the Company had considerable freedom to negotiate with a union. The board's resolution of what is essentially a factual issue is conclusive unless unsupported by substantial evidence on the record considered as a whole, or unless arbitrary or capricious. *Herbert Harvey, supra* 137 U.S.App.D.C. at 291, 424 F.2d at

9. There are numerous cases where the board exerts its jurisdiction over cost-plus-fixed-fee contractors. See *Herbert Harvey, supra* 137 U.S.App.D.C. at 290, 424 F.2d at 778; American Smelting and Ref. Co., 92 N.L.R.B. 1451, 1452 (1951).

10. The representative number and classifications required are as follows:

1 foreman,
23 tug and tractor drivers,
3 dispatchers,
4 equipment trouble shooters,
14 mechanics.
The foreman, trouble shooters and mechanics are to have three years minimum experience in their particular area.

779; *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 797, 798, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); *NLRB v. Hearst Publications*, 322 U.S. 111, 130–131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

The Company may be limited in some respects in its ability to bargain with a union, but no employer enjoys total freedom in this regard.[11] "The paramount question is whether enough authority over labor relations is lodged in such a contractor to enable a satisfaction of bargaining obligations under the act . . . ." *Herbert Harvey, supra* 137 U.S.App.D.C. at 290, 424 F.2d at 778. We agree that the Company retained sufficient control over the essentials of the employment relationship to enable it to bargain efficaciously.

As the second prong of its jurisdictional argument, the Company urges that its function is so intimately related to the operations of the air force that it should be excluded from the coverage of the act. Under the "intimately related" doctrine, the board will refuse to exercise its jurisdiction over an employer whose operations are so intimately connected with an exempt institution's operations that abstention from jurisdiction would promote the policies of the act.[12] "The extent to which the Board chooses to exercise its statutory jurisdiction is a matter of administrative policy within the Board's discretion, and in the absence of extraordinary circumstances whether jurisdiction should be exercised is for the Board, not the courts, to determine." *NLRB v.*

*W.G.O.K., Inc.*, 384 F.2d 500, 502 (5th Cir. 1967). This Company's maintenance and repair of equipment did not constitute direct involvement in the air force's national defense functions. It is clear that no "extraordinary circumstances" are involved and that the board's determination is due to be upheld.

## UNFAIR LABOR PRACTICES

The board found that the Company engaged in widespread interrogation of employees in violation of section 8(a)(1) of the act. The record is replete with examples of such interrogation conducted by many, if not most, of the Company's supervisors. Employer interrogation of employees concerning union sympathies may or may not be coercive depending on the surrounding circumstances. *NLRB v. Huntsville Manufacturing Co.*, 514 F.2d 723 (5th Cir. 1975); *NLRB v. Varo, Inc.*, 425 F.2d 293 (5th Cir. 1970). The test is whether the questioning tends to be coercive, not whether the employees are in fact coerced. *NLRB v. American Manufacturing Co.*, 132 F.2d 740 (5th Cir. 1943).

In *NLRB v. Varo, Inc., supra*, this court set out several factors deserving consideration in weighing the lawfulness of company interrogation of employees.[13] Applying such standard we conclude that there was substantial evidence supporting the board's holding that the Company repeatedly interrogated employees in violation of their rights under section 7.[14]

11. See *NLRB v. Atkins, supra* 331 U.S. at 413, 67 S.Ct. at 1273, where the court sustained the board's jurisdiction over militarized plant guards.

> [I]t matters not that respondent was deprived of some of the usual powers of an employer, such as the absolute power to hire and fire the guards and the absolute power to control their physical activities in the performance of their service.

12. See *Herbert Harvey, supra; Transit Systems, Inc.*, 221 N.L.R.B. 299 (1975); *Richmond Hospital of New Jersey, Inc.*, 168 N.L.R.B. 820 (1967).

13. Factors to be considered include:

(1) The history of the employer's conduct and attitude toward its employees;

(2) the nature of the information sought—for example, did the interrogator appear to be seeking information on which to base action against individual employees;

(3) the position or office of the interrogator in the company's hierarchy;

(4) the place and method of interrogation—was the employee summoned to the boss' office, or was there an atmosphere of "unnatural formality"? and

(5) truthfulness of the reply.

*NLRB v. Varo, Inc., supra* at 298.

14. The board found that no less than nine different supervisors including the Company's top management unlawfully interrogated or threatened Company employees.

■ The board further found that numerous threats were made by the Company which violated section 8(a)(1). Employee Anthony DelGiovno was told by a Company supervisor that if he went out on strike he would lose his chance to be promoted to a mechanic position. DelGiovno was also told that the Company would close in the event of organization. Several employees were told by supervisors that if they did not retract their union cards they would lose their jobs. The evidence in the record to support the board's conclusion that these and other threats violated section 8(a)(1) is clearly sufficient. *Hedstrom Co. v. NLRB*, 558 F.2d 1137 (3rd Cir. 1977); *NLRB v. Varo, Inc., supra.*

■ In addition to the unlawful threats and interrogations, the board found that the Company solicited grievances from employees with the express or implied promise that they would be remedied,[15] informed employees that they would be discharged for soliciting Union support at any time on Company premises,[16] solicited employees to sign a petition to withdraw their union cards,[17] and created the impression of surveillance[18]—all in violation of 8(a)(1). The board's decision concerning these violations is also supported by substantial evidence in the record.

■ The board found that issuance of warning slips to four employees violated section 8(a)(3). The warning slips did not specify any particular incident but referred to "interfering with other employees."

Two of the employees who received the slips had been identified as Union supporters only two days before at a supervisors' meeting. The employees were told later that the reason the slips were given was because they had been organizing on Company time. All four employees testified that they had not been utilizing Company time to organize. Insofar as the board's decision was based on credibility resolutions we may not disturb them and on this basis its findings with respect to this violation must stand.[19]

## NATURE OF THE STRIKE

The board found that the Company's refusal to reinstate unfair labor practice strikers was a violation of 8(a)(3) and (1). It is settled that unfair labor practice strikers "do not lose their status [as employees] and are entitled to reinstatement with back pay, even if replacements for them have been made." *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956).

Discussions concerning a strike were first held on October 8, 1975. By a secret ballot the 44 employees present on that date unanimously voted to authorize a strike. On October 16 a strike was again discussed and a second vote taken. On October 17 approximately 41 employees went on strike. The board found that the strike was an unfair labor practice strike.

■ The Company takes issue with the board's decision[20] arguing from the testi-

---

15. Solicitation of grievances to induce disaffection from the Union is in violation of 8(a)(1). *NLRB v. WKRG–TV, Inc.*, 470 F.2d 1302 (5th Cir. 1973).

16. A no-solicitation rule covering non-work time is overly broad and is an unreasonable impediment to the exercise of the right to self-organization. See *NLRB v. Central Power & Light Co.*, 425 F.2d 1318 (5th Cir. 1970); *Republic Aviation Corp. v. NLRB, supra.*

17. It is a violation of 8(a)(1) for an employer to "induce employees to sign any . . . form of union-repudiating document, particularly where the solicitation is strengthened by express or implied threats of reprisal or promise of economic benefit." *NLRB v. Birmingham Publishing Co.*, 262 F.2d 2, 7 (5th Cir. 1958).

18. Surveillance of employees which suggests coercions, or which inhibits the exercise of rights granted by the National Labor Relations Act, violates 8(a)(1). *Hedstrom Co. v. NLRB, supra.*

19. "It is not the functions of this court to decide the credibility of conflicting witnesses." *NLRB v. Varo, Inc., supra* at 298. See also *Hedstrom Co. v. NLRB, supra* at 1142 n. 12.

20. The administrative law judge concluded:
 I find that the employees herein were on strike because of the unfair labor practices. I see no evidence from which I could infer that they would have gone on strike if there had been no unfair labor practices. If there would not have been a strike but for the

mony that the strikers had economic and recognitional motives. It correctly points out that union members engaged in a strike for recognition cannot be insulated from the consequences of such a strike merely by mislabeling their action as an unfair labor practice strike. Here it believes that its employees "rejoiced" in the unfair labor practices rather than protested against them. It says in addition that the "but for" test of the board is not and has never been the law.

If an unfair labor practice is a "contributing cause" of a strike, then as a matter of law, the strike must be considered as an unfair labor practice strike. *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691 (7th Cir. 1976) citing *NLRB v. Wooster Div. of Borg-Warner Corp.*, 236 F.2d 898 (6th Cir. 1956), *rev'd on other grounds* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). The "causal connection" must be more than the awareness by employees of the protected status afforded unfair labor practice strikers. The fact that union representatives instructed the employees concerning the nature of the strike and its consequences thereby influencing the favorable strike vote should not obscure the real and actuating motivation. *NLRB v. Colonial Haven Nursing Home, Inc.*, supra, n. 25 at 705, 706.

In *NLRB v. Colonial Haven, supra*, the court found that employees were not unfair labor practice strikers as the board concluded, noting that the unfair labor practices were not the type reasonably expected to cause a union or employees to seek the self help use of a strike for correction. The unfair labor violations in *Colonial Haven* took place many days before the strike deci-

sion and the impetus for the meeting to obtain a strike vote was the receipt of a decision and order dismissing the representative petition.

 In the present situation, however, the strike vote taken on October 16 was a result of the numerous and widespread violations of the act committed by the Company within the previous ten days. Company employees testified that the reasons for the strike embraced both the purposes of securing union recognition and to eliminate the unfair labor practices.[21] The dual motivation does not deprive the employee of the status of an unfair labor practice striker if the employer's unfair labor practice was a contributing cause.[22] Our limited scope of review under the substantial evidence rule requires that we uphold the board's finding that the strike was motivated by the unfair labor practices of the Company.

## SEQUESTRATION OF WITNESSES

At the hearing before the administrative law judge the Company requested that general counsel's witnesses be sequestered in accordance with Federal Rule of Evidence 615. The administrative law judge refused to sequester witnesses who were alleged to have been discriminated against. The Company asserts that the failure to sequester witnesses resulted in prejudice. During oral argument counsel for the Company indicated that the Company was prejudiced both by the cumulative effect of the testimony on the administrative law judge and because the Company's ability to elicit contradictory testimony from the witnesses was severely limited.

unfair labor practices I conclude that the unfair labor practices had at least a causal relationship to the strike and the strike was therefore an unfair labor practice strike.

21. Employee George Bray testified that the reasons for striking were based on "a long period of things and, this one incident in particular [receiving a warning slip in violation of 8(a)(3)], . . . that was my prime motivation . . . ."
Employee David Sherman's reasoning was because "the people at Pope Maintenance in Cat-

egory C were treated very unfairly by a supervisor and that after going to the meeting and listening to how the people really felt and how I felt, I mean, I felt that I had every right to." Employee Danny Holland testified as follows: "I'm not saying I was only striking for the unfair labor—. . . but you got to put into consideration the benefits you're going to get."

22. See, *e. g., Southwestern Pipe, Inc. v. NLRB*, 444 F.2d 340 (5th Cir. 1971); and *NLRB v. Birmingham Publishing Co., supra*, note 17.

Section 10(b) of the act requires that hearings be conducted, so far as practicable, in accordance with the rules of evidence used in federal district courts. In *NLRB v. Stark*, 525 F.2d 422 (2nd Cir. 1975) *cert. denied* 424 U.S. 967, 96 S.Ct. 1463, 47 L.Ed. 734 (1976) the second circuit held that the ALJ should have the authority to sequester the alleged discriminatees and failure to have exercised that discretion in favor of sequestration would have been an abuse of discretion.

Both the second and fourth circuits have recognized "that sequestration is 'a simple and time-tested method for helping to discover the truth [which should] rank high in a list of evidentiary doctrines which courts, under § 10(b), should enforce upon the NLRB.'" *L. S. Ayres & Company v. NLRB*, 551 F.2d 586, 588 (4th Cir. 1977), citing *NLRB v. Stark, supra* at 427. We agree. There should be every effort made to ensure that the adverse party has the opportunity to develop any unfavorable or inconsistent testimony.

█ New rule 615 makes sequestration a matter of right. We find no reported cases determining the extent to which the new rule is applicable to board proceedings. In *Sturgis Newport Business Forms, Inc. v. NLRB*, 563 F.2d 1252 (5th Cir. 1977), this court found that since no prejudice resulted from the failure of the administrative law judge to sequester the witnesses, a decision as to the application of the new rule in board proceedings was there unnecessary. As in *Sturgis* we find that the absence of prejudice to the Company from such failure is clear from the record as a whole. Its argument that it suffered denial of due process of law as a product of the refusal to sequester witnesses is therefore without merit.

## APPROPRIATENESS OF THE REMEDY

█ Based upon the findings that the strike was caused by unfair labor practices of the Company, the board ordered reinstatement of the strikers with back pay.

The Company contends that the policy of automatically requiring immediate reinstatement to unfair labor practice strikers should not be followed in this case. The Company would have us reevaluate the conflicting rights of an employer to hire permanent replacements with the employees' right to strike. We have long recognized, however, that unfair labor practice strikers are entitled to immediate reinstatement even if permanent replacements have been hired. *Mastro Plastics Corp. v. NLRB, supra; National Fresh Fruit & Vegetable Co. v. NLRB*, 565 F.2d 1331 (5th Cir. 1978). We do not agree that the present situation demands a reconsideration of that policy.

█ The Company further opposes the board's issuance of a bargaining order. The issuance of bargaining orders is furnished clear support by *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) in a situation where, as here, unfair labor practices have the tendency to undermine majority strength and impede the election processes.

Essential to the board's determination that a bargaining order was appropriate was its finding that at some relevant time the Union had represented a majority of the employees in an appropriate unit. The Company challenges the majority status because of widespread misrepresentations made by solicitors of the authorization cards on which such majority determination must rest. We are mindful of the importance of a valid card majority in an effort to protect employee free choice. The record shows that the administrative law judge considered all evidence and testimony surrounding each of the cards challenged by the Company.[23] There is substantial evidence in the record to support the finding of a valid majority.

█ The Company also opposes the bargaining order because it claims that the underlying bargaining unit designation is contrary to board policy. The designated unit contains negotiation-inspectors who

---

**23.** The ALJ considered 70 cards and rejected 5. One was subsequent to the critical date. He thus determined that the Union held 64 valid cards out of 106 employees in the unit.

are responsible for negotiating with air force personnel to determine a price for the non-standard items. The Company states that these employees are clearly managerial employees and may not be included under the coverage of the act. The courts have consistently regarded these unit determinations as necessarily based upon informed discretion. On review they are thus subject to judicial challenge only for a finding that the board has exercised its discretion in an arbitrary or capricious manner. *NLRB v. Crockett-Bradley, Inc.*, 523 F.2d 449 (5th Cir. 1975); *Spartans Industries v. NLRB*, 406 F.2d 1002 (5th Cir. 1969). The capability of negotiator-inspectors to negotiate and bind the Company on the projected number of man-hours for non-standardized jobs does not automatically confer managerial status. There must be a showing that the employees in question have the authority to formulate, determine or effectuate management policy. *Eastern Camera and Photo Corp.*, 140 N.L.R.B. 569, 571 (1963) cited with apparent approval in *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 290 n. 19, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).

The order of the board will be enforced.

ENFORCED.