BOARD OF TRUSTEES OF the MEMORIAL HOSPITAL OF FREMONT COUNTY, WYOMING, a Political Subdivision of the State of Wyoming, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

LUTHERAN HOSPITALS AND HOMES SOCIETY OF AMERICA, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 77–2000, 77–2024.

United States Court of Appeals, Tenth Circuit.

Argued March 15, 1979.

Decided July 3, 1980.

William A. Smith, Lander, Wyo. (Paul V. Butz of W. A. Smith and Associates, Lander, Wyo., were on brief), for petitioner Board of Trustees of the Memorial Hospital of Fremont County, Wyoming.

James Baird, Chicago, Ill. (Joel H. Kaplan of Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., was also on brief), for petitioner Lutheran Hospitals and Homes Society of America; Stanislaw J. Damas of Mulligan & Damas, P. C., Denver, Colo., of counsel.

Christine Weiner Peterson, Washington, D. C. (Janet C. McCaa, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., were on brief), for respondent.

---

* Honorable Jack Richard Miller, United States Court of Customs and Patent Appeals, Washington, D. C., sitting by designation.

1. The Board Decision and Order are reported at 233 N.L.R.B. No. 81.

Before HOLLOWAY and McKAY, Circuit Judges, and MILLER, Judge.*

HOLLOWAY, Circuit Judge.

This opinion considers the consolidated petitions of the Lutheran Hospitals and Homes Society of America ("Society") and the Intervenor Board of Trustees of the Memorial Hospital of Fremont County, Wyoming ("Trustees"), to review and set aside an order of the National Labor Relations Board ("Board"). The Board found that the Society violated Sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and(1)[1] by refusing to bargain with the Wyoming/Montana Association, American Nurses' Association ("Association"), which the Board had certified as the bargaining representative of a unit of registered nurses at the Bishop Randall Hospital in Lander, Wyoming. The Board filed a cross-application for enforcement of its order. The main question presented is whether the Board properly exercised jurisdiction on the unfair labor practice charge.

## I

## THE FACTUAL BACKGROUND

### a. *The history of the hospital*

The Bishop Randall Unit of the Memorial Hospital of Fremont County ("the Hospital") is located in Lander, Wyoming, one of two major population centers in Fremont County, Wyoming. The County acquired and subsequently improved the Hospital with local public funds in 1960, pursuant to a Wyoming statute authorizing county governments to establish public hospitals for the care of their sick and injured.[2] In 1950 the County had built its first and only other public hospital in Riverton, Wyoming, pursuant to the same statutory authority.[3]

---

2. Prior to 1960, the Hospital was owned by private parties and operated by the Lander Chamber of Commerce.

3. Wyoming statutes authorize counties to exercise the power of eminent domain where necessary to acquire land, to issue bonds and accept subscriptions from the public to finance the

As required by statute, the publicly elected County Commissioners appointed the five-member Board of Trustees to oversee the operations of the two county hospitals and expenditures out of the county memorial hospital fund.[4] The Trustees, who serve without compensation, are charged with the same duties and responsibilities and possess the same liabilities and immunities as all Wyoming public officials and are removable from office in the same manner as such officials.

Upon construction of the Riverton Hospital in 1950, and again upon acquisition of the hospital in Lander in 1960, the Trustees, pursuant to their statutory authority, contracted out the operation of the hospitals to the Society.[5] (R. 2177; R. 13–14, TX 51). Under the 1975–1990 lease agreement and the "Articles of Organization and Understanding," the Trustees agreed to lease the grounds, building and equipment of the Hospital for a nominal consideration. In return, the Society agreed to secure a license to operate the Hospital in accordance with standards prescribed by the Wyoming State Board of Health; to take charge of and be responsible for the operation of the Hospital; to have its Board of Directors serve as the Governing Board of the Hospital and to appoint qualified physicians to staff the Hospital; to appoint an administrator to carry out the Society's policies and programs in the Hospital; to hire and supervise supporting staff; to maintain the grounds, building and equipment; and to furnish supplies, replace worn equipment and make alterations and improvements to any part of the premises.[6] The Society further agreed to set fees and charges at rates not exceeding those charged by comparable Wyoming hospitals, and to provide medical care to indigent residents of the County.[7]

b. *The background of the labor controversy*

In November 1974 the Association filed a petition with the Board seeking certification as the collective bargaining representative of the Hospital's registered nurses pursuant to section 9(c) of the Act, 29 U.S.C. § 159(c). A hearing was held in Lander, Wyoming in January 1975 and the case was thereafter transferred to the Board for decision.[8] In May 1975 the Board ruled that:

> Although the terms of these agreements cover the operations of both hospitals, hereinafter reference will be made to "the Hospital" (Lander) as this is where the unfair labor practices are alleged to have occurred.

purchase or construction of hospitals, to levy property taxes to retire bond issues and finance improvements, repairs, alterations and general maintenance. Hospital property owned by the county is exempt from state and local property taxes. (R. 2175; TX 51). Wyo.Stat. §§ 18–8–101 *et seq.*

4. The "county memorial hospital fund" is the money set aside from the collection of property taxes which the county has been authorized to levy. *Id.*

5. The first agreement, providing for the lease and operation of the Riverton Hospital for a term of 15 years, was executed in 1950. (R. 2177). That agreement was superseded by a lease agreement executed by the parties on February 3, 1960, which was to be effective for a 15-year term ending on February 3, 1975, providing that the Society would lease and operate both the Riverton and Lander Hospitals. (R. 2177; TX 3). That agreement was renewed for another 15-year term on January 22, 1975. (R. 2177; TX 2). In September 1973 the parties executed a document entitled "Articles of Organization and Understanding" which further clarified the relationship between the parties.

6. Approval of the Trustees is required if such changes involve the "structural integrity" of the buildings. (TX 2 ¶ 6).

7. The Society was organized in 1937 by a group of Lutheran clergy and laymen as a non-profit North Dakota corporation and is governed by a 21-member Board of Directors chosen from its membership. The Society currently operates numerous hospitals, nursing homes, homes for the aged and a hospital school for crippled children throughout the United States. Some of these institutions are owned by the Society and others are operated, like the Hospital, through lease agreements with the owners. (R. 2178; TX 47). The Hospital, like all of the institutions, is operated through an administrator appointed by the Society's president. (R. 2178).

8. Although the Trustees did not formally participate as a party in the representation proceedings, the Trustees' counsel, W. A. Smith, appeared as the Society's major witness. (R.

(1) the Society was the employer of the registered nurses within the meaning of § 2(2) of the Act; (2) the Trustees did not constitute a joint employer with the Society; and (3) the services provided by the Society were not so "intimately connected" with the operation of an exempt institution as to warrant exercise of the Board's discretionary authority to decline to assert jurisdiction. In addition, the Board found that the requested unit of registered nurses was an appropriate unit. Accordingly, the Board asserted jurisdiction and directed an election.[9]

On September 28, 1975, a majority of the Hospital's eligible registered nurses cast ballots in favor of Association representation.[10] The Board certified the Association as the exclusive representative of the registered nurses at the Hospital on October 10. Following the Board's certification, the Association requested that the Society commence collective bargaining on or before November 1. On October 21 the Society's Administrator at the Hospital, Roger A. Lehr, sent a letter to the Trustees' counsel, W. A. Smith, requesting that he bring the Association's bargaining request to the attention of the Trustees. By letter dated October 23 the Trustees advised Lehr that the matter would be taken up at the regular November 10 meeting of the Board of Trustees.[11]

Prior to the November 10 meeting, representatives of the Trustees and the Society negotiated amendments to their 1975–1990 Lease Agreement. (R. 2180–82; TX 13). The preamble to the amendatory agreement referred to recent proceedings before the Board, to doubt about the degree of control of the Trustees over the Hospital's operations, and to the Trustee's demand for a clarifying amendment. The parties then agreed that except as specifically amended, the provisions of the 1975 lease would remain in full force and effect. They agreed that the Society would continue to have full responsibility for operation of the Hospital in accordance with the lease agreement, but inserted the qualification "subject to the control reserved to the lessor." (R. 2182; TX 13 ¶ 10).

In addition to the control reserved to the Trustees under prior agreements, the amendatory agreement provided that the Society could not enter into any written contract of employment with any person or any collective bargaining agreement without first obtaining express written approval

---

2173 n.1). At the hearing, the parties stipulated that the Society:

. . . has day-to-day operation and control of [the] hospital within the terms of the lease, or subject to the terms of the lease, that includes day-to-day decisions to hire, to fire, to institute personnel rules or regulations. . . .
(R. 30–31).

The Society subsequently objected to offer of the stipulation at the unfair labor practice proceeding on the basis that it was made without full knowledge of the facts. The objection was not ruled on, but the ALJ said he would consider the whole record. (R. 834).

9. The Board's Decision and Direction of Election is reported at 217 NLRB No. 185. Member Kennedy dissented from the Board's assertion of jurisdiction.

10. The election had originally been scheduled for June 27, 1975. (R. 1978). However, on June 26 the Trustees obtained a permanent injunction from the United States District Court for the District of Wyoming barring the election on the ground that it involved an employer exempt from the coverage of the Act, Circuit Judge Barrett sitting by designation. 89 LRRM 2822. This court reversed and held that judicial review of certification proceedings could not be had prior to the entry of an unfair labor practice order. *Board of Trustees of Memorial Hospital of Fremont County, Wyoming v. N.L.R.B.*, 523 F.2d 845 (10th Cir.).

11. The letter stated that the Trustees' position was that the Society was not an employer under the Act and that the Society "should not and cannot be involved in collective bargaining which would in any way ultimately increase the cost or disrupt the operations of the hospital in violation of Wyoming Statutes under which the hospital must be operated by the [Trustees]." Accordingly, the Trustees felt that any decision to bargain with the Association would have to be approved by them, and they requested that the Society attempt to extend the time suggested for the commencement of negotiations until some time after the scheduled November 10 meeting. (TX 12).

from the Trustees. (R. 2181; TX 13 ¶ 3).[12] Approval of the Trustees was also required before the Society could increase room rates at the Hospital. (R. 2182; TX 13 ¶ 4).

The amendatory agreement further required the Society to submit semi-annual reports showing its receipts and expenditures, and the Hospital's financial condition. These reports were to include a list of all persons employed in each unit of the Hospital, the salary ranges for each job classification, and the total wages expended for each classification. In addition, the parties agreed that prior to the beginning of each calendar year, the Society would provide the Trustees with recommendations concerning minimum and maximum staffing, wage rates and fringe benefits for each job classification, together with the Society's certification that except in emergencies or situations beyond its control, it would not deviate from the authorized ranges during the following year without the Trustees' express written consent. The Trustees reserved the right to approve or disapprove those portions of both the annual and semi-annual reports concerning staffing, wage rates, fringe benefits, the employment of any person and the total compensation paid to all employees in a given job classification. (R. 2181; TX 13 ¶ 3).[13]

The amended lease agreement was ratified by the Trustees at their November 10, 1975, meeting and immediately executed by an official from the Society's home office who was in attendance at the meeting. At the same meeting the Trustees adopted a resolution directing the Society to refrain from entering into collective-bargaining with the Association pursuant to the latter's previous request. (R. 2182; TX 14). The Trustees advised the Society of the resolution in a letter sent the same day. (R. 2182; TX 15).

By letter dated November 21, 1975, Lehr notified the Association of the Trustees' action and stated that in compliance with the Trustees' directive, the Society was refusing to bargain. (R. 2183; TX 16). The Society has since persisted in its refusal to meet and bargain with the Association concerning the Hospital's registered nurses.

### c. The proceedings on the unfair labor practice charge

On November 17, 1975, the Association filed an unfair labor practice charge alleging that the Hospital's refusal to bargain violated sections 8(a)(1) and (5) of The Act, 29 U.S.C. §§ 158(a)(1) and (5). A complaint based on this charge and an amendment thereto were issued respectively on November 28 and December 8. The Trustees sought to intervene in this proceeding and the Society and the Trustees filed answers and motions for summary judgment challenging the Board's assertion of jurisdiction.

In addition, the Society filed a motion to revoke certification alleging that the amended lease clearly established that the Trustees were the employer of the newly certified unit of registered nurses and were exempt under § 2(2) of the Act, or that the Society was at most a joint employer with the Trustees and thus shared the latter's § 2(2) exemption. The General Counsel for the Board opposed the Society's motions on the ground that they raised factual issues regarding the identity of the employer which could best be resolved by an evidentiary hearing. The Board denied the motions for summary judgment, granted the Trustees' motion to intervene, and ordered that the Society's motion to revoke certification be consolidated with the unfair labor practice charge for hearing before an Administrative Law Judge ("ALJ"). The ALJ held this hearing [14] and the Board adopted

---

12. Any breach of this provision or interruption of services by reason of a strike, lockout, slowdown or other concerted interference with normal operations was to be considered grounds for termination or cancellation of the lease. (R. 2181–82; TX 13 ¶ 3).

13. If the Trustees failed to notify the Society in writing of its disapproval within 60 days after the submission of any report, the report was to be deemed approved. (TX 13 ¶ 3).

14. The hearing was held in Lander, Wyoming, on September 8 and 9, 1976, and the ALJ's

his decision with minor modifications not here relevant. The Board thus adopted findings which essentially were as follows:

It was found that the Society controlled the operation of the Hospital and was thus the sole and exclusive employer of the Hospital's registered nurses within the meaning of § 2(2) of the Act. Although the Trustees constituted a political subdivision exempt from the Act's coverage, the Trustees essentially acted as consultants and advisors and therefore were not a joint employer with the Society. The Board found that the Society's operation of the Hospital was more akin to that of a private enterprise than a public function and was not so "intimately connected" with a governmental function as to warrant the Board's discretionary declination of jurisdiction.

With respect to the 1975 lease amendments, the Board found that the Society continued to operate the Hospital as the sole employer of the registered nurses subsequent to November 10, 1975. It was found further that even were it presumed that the existence of the additional powers by the Trustees over the Society was a sufficient indication of increased control by the Trustees to warrant the Board's declining jurisdiction as a general premise, nevertheless jurisdiction should be exercised. The decision said that the Board and the federal courts "have consistently held a respondent may not circumvent the issuance of an order designed to remedy his conduct violative of the Act by interposing a contract he has executed, without regard to the apparent (on its face) legality of the contract in question   .   .   ." (R. 2184).

The Board concluded that it had properly asserted jurisdiction over the Society, reaffirmed its determination that the Hospital's registered nurses constituted an appropriate unit, and held that the Society's refusal to bargain violated §§ 8(a)(1) and (5) of the Act. It ordered the Society to cease the unfair labor practice and to engage in bargaining with the Association, *inter alia*.

decision was issued on March 15, 1977. (R. 2173, 2189).

**15.** Additionally the Society asserts that the Board's designation of just the registered nurs-

II

## THE QUESTION OF THE BOARD'S JURISDICTION

The Society argues that the Board is without jurisdiction because: the Hospital is an exempt "political subdivision" within the meaning of § 2(2) of the Act; the Trustees, who are admittedly exempt from the Act, control labor relations at the Hospital to such an extent that they are at least a joint employer; the services rendered by the Society are "intimately connected" with the exempt Trustees' legislatively mandated purpose; and the Society lacks the authority to bargain.[15]

The Intervenor Trustees make generally similar attacks on the Board's jurisdiction, saying the Trustees are the actual owner and operator of the Hospital and the employer of the nurses, the Society being an agent under the Trustees' control; that in any event, the Trustees are at least a joint employer so that neither they nor the Society are subject to the Act; that the Trustees are forbidden to bargain collectively by Wyoming law and decisions; that the contractual provisions prohibiting collective bargaining by the Society are valid and not unenforceable as the Board found; and that the Board's exercise of jurisdiction is violative of the Trustees' right to contract and the Tenth Amendment of the Federal Constitution.

The General Counsel responds that the critical question is whether the private party employer has control of the employment relationship; that under both the pre-1975 contractual provisions and the 1975 amendments, the Society maintained exclusive actual control over the relationship, which was also borne out by the practices of the parties; that the Society had sufficient control to engage in meaningful collective bargaining; and that the Board's findings on

es as a bargaining unit was error. We need not reach this point since we uphold the attack on the Board's exercise of jurisdiction.

these points sustaining its jurisdiction are supported by substantial evidence.

We must agree with the challenge of the Society and the Trustees to the Board's exercise of jurisdiction for reasons which follow. We do not, however, find it necessary to address all the theories pressed by the Society and the Trustees.

a. *The validity of the lease amendments*

■ At the outset it is necessary that we decide the validity and effect to be given to the 1975 lease amendments clarifying the control of the Trustees over the Hospital's operations. The provisions of the amendments significantly affect the resolution of the questions before us.

As noted, the Board found that the Society had executed the lease amendments for the purpose of circumventing its statutory duty to bargain and declined to give them effect. It is important to note the full reasoning of the ALJ, which the Board adopted on the 1975 agreement (R. 2184):

> And even were it presumed the existence of the new or additional powers granted by the Society to the Trustees under the November 10, 1975 Lease amendments are sufficient indicia of increased control over the former by the latter to warrant the Board's declination of jurisdiction as a general premise, I would nevertheless find under the circumstances of this case such jurisdiction should be exercised. The Board and the federal courts have consistently held a respondent may not circumvent the issuance of an order designed to remedy his conduct violative of the Act by interposing a contract he has executed, without regard to the apparent (on its face) legality of the contract in question (*Garment Workers v. N.L.R.B. & Bernhard-Altmann Texas Corp.*, 366 U.S. 731 [, 81 S.Ct. 1603, 6 L.Ed.2d 762]; *Williams, et al. v. Wisc. [Wis.] Barge Line, Inc.*, C.A. 7, 416 F.2d 28, cert. denied, 396 U.S. 1060 [, 90 S.Ct. 755, 24 L.Ed.2d 753]; *N.L.R.B. v. American Beef Packers, Inc.*, C.A. 10, 438

F.2d 996 [331], cert. denied, 414 U.S. 1002 [403 U.S. 919, 91 S.Ct. 2232, 29 L.Ed.2d 691]; etc.). The timing and circumstances of the Society's negotiation of the Lease amendments and the language of the preamble thereto clearly show the Society intended by such amendments (and their immediate specific exercise in the issuance of a Trustee order directing the Society's refusal to bargain with the Association) to circumvent the application of federal labor policy to the Society following the success of the Lander Hospital's registered nurses in securing the certification of the Association as their exclusive representative for collective-bargaining purposes and the consequent duty of the Society under federal labor law to meet and bargain with the Association concerning those nurses' rates of pay, wages, etc.

> Under these circumstances I find and conclude the 1975 Lease amendments (and their specific exercise in the issuance thereunder of a Trustee order directing the Society to refuse to comply with the Association's request for bargaining) should not, and shall not be given any force or effect.

The Society argues that the Board's finding on its intent is not supported by the record; [16] that the cases on which the Board relies are inapposite; and that the Board cannot constitutionally void the lease amendments since this interferes with the right of a political subdivision of the State (the Trustees) to contract for the operation of its hospitals and the running of its governmental entities as it chooses, citing *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245.

While we feel that the evidence is not strong with respect to the finding on the intent of the Society, we cannot say in the circumstances that the finding is not supported by substantial evidence in view of the timing, the wording of the preamble agreed to by the Society, and the Society's

---

16. Indeed, the Society maintains that the question of its intent was never litigated and that the General Counsel did not raise the issue until after the hearing when its brief was submitted.

prompt approval of the amendment. It is nevertheless unmistakably clear that the Trustees insisted on the amendment and no argument or evidence to the contrary is cited. While of course no devious maneuvers or any misstated documents should be countenanced, there is no suggestion of such misconduct here. Accordingly we are persuaded that the Trustees and the Society can be said to have both agreed to clarify and strengthen the Trustees' control of the relationship with the nurses and other employees with the objective of taking advantage of the political subdivision exemption. We see nothing unlawful in such an agreement.[17] The exemption provided by Congress can be utilized by making a lawful contractual arrangement to come within it, which we feel was done here. *See Fleet Transport Co., Inc., et al.,* 196 NLRB No. 61 at 437, 439; *Local 777 v. N.L.R.B.,* 603 F.2d 862, 882–83 (D.C.Cir.).

We thus conclude that no valid reason is shown for disregarding the lease amendments and hold that they should be considered fully effective.[18]

b. *The "political subdivision" exemption*

■ Section 2(2) of the Act as amended, 29 U.S.C. § 152(2), exempts "political subdivisions" from the coverage of the Act.[19] The exemption has been construed by the Board to be limited to entities that are either (1) created directly by the State so as to constitute departments or administrative arms of the Government, or (2) administered by individuals who are responsible to public officials or to the general electorate. *NLRB v. Natural Gas Utility District of Hawkins County,* 402 U.S. 600, 604–05, 91 S.Ct. 1746, 1749, 29 L.Ed.2d 206; *NLRB v. Austin Developmental Center, Inc.,* 606 F.2d 785, 789 (7th Cir.); *N.L.R.B. v. Highview, Inc.,* 590 F.2d 174, 176 (5th Cir.), *modified on other grounds,* 595 F.2d 339 (5th Cir.). As in the *Hawkins County* case, we need not decide whether these limitations mark the bounds of the exemption, for here there is no dispute on the point that the Board of Trustees is an exempt political subdivision. Here the Board found, and we agree, that:

> [t]he Trustees operate as a public body and possess the same duties, responsibilities, powers, liabilities and immunities as all Wyoming public officials and are removable in the same manner as such officials are removable; *the Board of Trustees is a political subdivision within the meaning of Section 2(2) of the Act.*

(R. 2177) (Emphasis added).

The Society staunchly argues however that it is the Hospital, not just the Trustees, which is the political subdivision and that the Board has misconstrued the intent to exempt the operational entity rather than the people charged with its control. According to the Society, to find the Trustees

---

**17.** The cases relied on by the Board in its decision are distinguishable. Thus, *International Ladies' Garment Workers Union, AFL-CIO, v. N.L.R.B.,* 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762, held invalid a collective bargaining agreement, executed with a minority union, which was obtained under false pretenses of majority representation. In response to the Union's insistence that [the] agreement be held valid and enforceable as to those employees who in fact consented to it, the Court held that "the unlawful genesis of the agreement precludes its partial validity." *Id.* at 737, 81 S.Ct. at 1607.

Similarly, both *N.L.R.B. v. American Beef Packers, Inc.,* 438 F.2d 331 (10th Cir.), *cert. denied,* 403 U.S. 919, 91 S.Ct. 2232, 29 L.Ed.2d 691, and *Williams v. Wisconsin Barge Line, Inc.,* 416 F.2d 28 (7th Cir.), *cert. denied,* 396 U.S. 1060, 90 S.Ct. 755, 24 L.Ed.2d 753, involved collective bargaining agreements which were invalidated because the unions did not represent an uncoerced majority of the employ-

ees. Thus these cases do not support the Board's holding on this point.

**18.** The General Counsel's brief to this court does not seem to rely on the Board's reasoning that the 1975 amendments should be disregarded because they attempted to circumvent the issuance of an order. (Brief for the Board at 36–37). The General Counsel makes a different interpretation of the Board's holding—that the Board instead found that the parties had attempted an apparent change while maintaining their relationship as it had always existed. We do not agree with that interpretation of the Board's ruling. Nor do we feel that such a view of the parties' conduct is justified.

**19.** 29 U.S.C. § 152(2) in pertinent part provides:

> The term "employer" . . . shall not include . . . any state or political subdivision thereof . . . .

alone exempt from the Act is meaningless, as the only reason for the Society's existence is to run the Hospital.

We need not, however, consider whether this argument of the Society may have merit. We believe this controversy should be decided under other standards which have already been applied in similar cases, and we turn to that analysis.

### c. Authority to engage in meaningful collective bargaining and the joint employer concept

■ Where a private employer who has contracted to provide services to an exempt political subdivision does not retain sufficient control over the employment relationship to engage in meaningful collective bargaining, § 2(2) deprives the Board of jurisdiction because the exempt subdivision is deemed the true employer. *See N.L.R.B. v. Austin Developmental Center*, 606 F.2d 785, 789 (7th Cir.); *N.L.R.B. v. Highview*, 590 F.2d 174, 177 (5th Cir.); *N.L.R.B. v. Pope Maintenance Corp.*, 573 F.2d 898, 902 (5th Cir.); *Compton v. Nat. Maritime U. of America, AFL-CIO*, 533 F.2d 1270, 1275 (1st Cir.). The governmental subdivision's substantial control over the labor relations policies of the party contracting with the governmental agency requires the Board to decline to assert jurisdiction. *Mon-Yough Community Mental Health and Mental Retardation Services, Inc.*, 227 NLRB No. 172. The Act does not require an employer to engage in an exercise in futility for " 'the purpose of collective bargaining is to produce an agreement and not merely to engage in talk for the sake of going through the motions.' " *Herbert Harvey, Inc. v. N.L.R.B.*, 424 F.2d 770, 775 (D.C.Cir.).

■ In the instant case the Board found that:

There is no evidence since the adoption of the November 10, 1975 amendments . . . [that] the Society has done other than continue in effect at Lander Hospital its uniform fringe benefit and employment policies, its wage and staffing policies and procedures, etc., nor that the Trustees have done other than accept the Society's decisions in these areas, as was the practice previous to the amendments. . . . [T]he Society retained and continued to exercise such control over the operations of the Lander Hospital to warrant a finding it continued to qualify as the sole employer. . . .

(R. 2183–84).

The determination whether the employer retains sufficient control over the employment relationship to enable it to bargain effectively with its employees here necessarily requires an examination of the parties' agreements and their actual practices. *See e. g., Catholic Bishop of Chicago, A Corporation Sole*, 235 NLRB No. 105 at 776–77. Here the Board failed to consider fully the extent to which the lease amendments diminished the Society's control over labor relations because the Board held that the amendments should not be given any force or effect. (R. 2184).[20] In thus ignoring their effect, the Board erred. Giving consideration to the original contract, the amendments and the evidence of the practice of the parties as well, we are convinced that the Society was clearly unable to engage in meaningful collective bargaining so that the Board lacked jurisdiction.

As noted, under the terms of the amendatory agreement the Society must submit semi-annual reports which are to include, *inter alia*, a list of all persons employed at each unit of the Hospital, together with the

---

**20.** The Board did give some limited consideration to the amendments, despite its rejection of them generally. It said that the amendments purported to:

reaffirm the September 27, 1973 'Articles of Organization and Understanding' between the Society and the Trustees wherein it was agreed the Society's Board of Directors constituted the Governing Board of the two hospitals, the president of the Society controlled and administered the affairs of the two hospitals through his appointed Administrators, the Administrator would inform the Trustees concerning the Society's policies and programs and their application within the hospitals, and the Trustees would 'assist, advise, counsel and guide the Administrator and the Governing Board . . . .'

(R. 2183).

salary ranges and the total wages expended for each job classification. In addition, prior to the beginning of each calendar year, the Society is required to submit recommendations for each unit at the Hospital to the Trustees concerning minimum and maximum staffing, wage rates and fringe benefits for each job classification. Such recommendations are to be accompanied by the Society's certification that except in emergencies or situations beyond its control, the Society will not deviate from the authorized ranges during the following year without the Trustees' express written consent.

The Trustees reserve the right, within 60 days after submission of these reports, to approve or disapprove the recommended authorized staffing, wage rates and fringe benefits; the employment of any person listed; and the total wages paid to all employees in any given classification.[21] If no written notice of disapproval is delivered to the Society prior to the expiration of the 60-day period, the recommendations or, in the case of the semi-annual report, the continued employment and wages paid to employees in a given classification, are deemed

approved.[22] The amendatory agreement also provides that the Society shall not increase the daily room rates at the Hospital without the Trustees' express written consent.

Perhaps the most important portion of the amendatory agreement is the provision controlling bargaining agreements:

[The Society] further agrees not to enter into any written contract of employment with any person for employment at the hospital, or any collective agreement covering terms and conditions of employment at the hospital without the express written consent of [the Trustees], and [the Society] further agrees that any breach of this provision shall be grounds for termination of this lease upon the giving of sixty days notice  .  .  . .

(R. 1482, 2181; TX 13 ¶ 3).

It is difficult to imagine a more stringent restriction on the Society's ability to bargain effectively. To be sure, the language of this provision does not, as the General Counsel points out (Board Brief at 31), prohibit the Society from engaging in collec-

---

**21.** The General Counsel contends that the Trustees' right to approve or disapprove the Society's recommendations does not significantly interfere with the Society's control because: (1) once Trustee approval is obtained, the Society has the authority to determine staffing needs and make salary determinations within the established ranges; and (2) the escape clause (e. g., emergencies or situations beyond control) will permit the Society to ignore these restraints altogether. (Board Brief at 29).

We disagree. First, the fact that the Society has some discretion within the authorized ranges does not negate the fact that the Trustees have the ultimate authority to set the ceiling and floor with respect to staffing and wage rates. The restraints imposed on the Society here clearly distinguish the instant case from those where the exempt institution only indirectly limits employee compensation by placing a ceiling on the private employer's total budget. See Austin Developmental Ctr., supra, 606 F.2d at 789 n.8; Herbert Harvey, supra, 424 F.2d at 778–79. Second, the Society retains no similar discretion with respect to fringe benefits. Lastly, the General Counsel's contention regarding the "escape clause" is unfounded and speculative.

We also disagree with the General Counsel's contention that the Trustees' right to disapprove total wages paid for any classification

and the employment of any individual is no more than a "reporting and monitoring device" because such disapproval, if exercised, will have no retroactive effect. (Board Brief at 30). The General Counsel has ignored the prospective impact of the Trustees' authority. Obviously if the Trustees disapprove of an employment decision or wages paid for the preceding six months, the operative effect of the decision will cease from that time forward.

**22.** In the event the Trustees choose to disapprove, the parties are to meet and discuss the reasons for disapproval and attempt to resolve their differences. Barring a mutually satisfactory resolution, either party has the right to terminate the lease agreement after giving 60 days' notice. (R. 1482, 2182; TX 13 ¶ 3). The General Counsel claims that the absence of a contractual right in the Trustees to make a final and binding decision is indicative of the Trustees' lack of control. (Board Brief at 30 n.24).

We disagree. Although the Trustees have no such right, the Society obtains no real control as a result. A veto power in these matters is retained by the Trustees. If they cannot settle their differences with the Society, the Trustees can cancel the agreement and replace the Society with a more agreeable operator.

tive bargaining. However, the test is not whether the private employer can engage in any bargaining, but whether he can engage in *meaningful* bargaining. Clearly any bargaining attempted by the Society subject to such a veto could not reach a collective agreement which the Society alone could be prepared to execute.[23] Indeed, in *Ohio Inns, Inc.*, 205 NLRB No. 102 at 529 n. 3, where the state also retained extensive control over labor relations, the Board acknowledged the futility of asserting jurisdiction:

> Our inquiry must be as to whether the State by its agreement has retained substantial effective control over labor relations policy affecting the concessionaire and it employees.

> \*     \*     \*     \*     \*     \*

> The reason for this inquiry has practical, as well as legal, roots. When parties are subject to our jurisdiction, certain rights and obligations attach, and we must have the authority to enforce those rights and obligations. For example, when parties negotiate to the point of agreement, we have the authority to require that they reduce their agreement to writing, execute it, and thenceforward implement it. *But when, as here, the State of Ohio has the power to disapprove of any collective agreement, any attempt on our part to enforce our law, in the event of such disapproval, would create an irresolvable confrontation between Federal and State authority.*

> \*     \*     \*     \*     \*     \*

> [W]hat we do not wish to do is to create a dilemma wherein an attempt by Ohio

Inns to obey the law—including one of our orders—can be frustrated by the State's exercise of its contractual right to control labor relations. *No provision of the agreement or of our law or of Ohio law requires the State to accede to regulation by this Agency . . . .*

The same potential for confrontation between federal and state authority exists in the instant case. Under the contractual provisions, the Trustees clearly could frustrate an order of the Board by exerting their rights under the agreements with the Society, as was possible in *Ohio Inns.*

The practices of the parties indicate no different conclusion concerning the Trustees' powers. The Trustees' actual control over labor relations at the Hospital is demonstrated by the continuous dialogue over nurses' salaries which took place at the Trustees' meetings during the spring and summer of 1976. At the meeting held on March 8 Society representative Peter Olsen raised the problem of a shortage of nurses and "suggested the probable necessity of offering better pay to compete with the training school salary scale. . . ." The Trustees approved his recommendation that a study should be conducted. (TX 22). On April 12 the Hospital's Administrator reported to the Trustees concerning the starting salaries at other hospitals in the area and informed them that the County Hospitals "will be forced to raises to meet the competition and recruit more nurses." (TX 23).

At the meeting on May 10 the Trustees were again advised that other competitors were starting their nurses at higher salaries

---

**23.** The General Counsel claims (Board Brief at 31) that the "Trustees' right of approval is consistent with the limitations on personnel decisions and the generalized budgetary restraints found in the other provisions and does not by itself or in conjunction with other provisions significantly impair the Society's control of the employment relationship," citing *N. L. R. B. v. E. C. Atkins & Co.*, 331 U.S. 398, 408, 67 S.Ct. 1265, 1270, 91 L.Ed. 1563 and *Compton v. National Maritime Union of America, supra*, 533 F.2d at 1270.

We disagree for reasons already stated. Moreover, this restriction on the Society's ability to bargain meaningfully is far more significant than that involved in *E. C. Atkins*, (military reserved right to veto employment of any plant guard where federal contractor was engaged in production of war materials); or *Compton*, (exempt governmental agency had participated in some labor negotiations and had signed labor contracts as guarantor; but private managing company hired by a call to a union hiring hall, had the power to fire, and alone or as a member of a multi-employer group had negotiated contracts with numerous labor unions).

and that "Fremont County will be sitting in the 'hot seat'" if salaries were not raised. (TX 24). On June 7 the Trustees approved a request by the Administrators at the Riverton and Lander Hospitals to have another month to study the matter before submitting their recommendations. (TX 25). Finally on July 12, four months after the problem was first brought to their attention and after repeatedly reviewing evidence that the Hospital's salaries were not competitive with others in the area, the Trustees approved an increase in nurses' salaries.[24]

The record reveals that the Trustees maintain similar control over fringe benefits. In September 1975, as a result of complaints by the Hospital's nurses, the Trustees insisted that the Society change its practices of issuing checks without notation of payroll deductions and of excluding new employees from health insurance coverage during their initial six month trial period. (R. 899–901, TX 10). These changes were immediately implemented. (R. 901, TX 11). In addition, the current pension plan was put into effect only after the Trustees reviewed its cost impact and subsequently gave their approval. (R. 984).

With respect to staffing, the record shows that in accordance with the terms of the amendatory agreement the Trustees have reviewed and approved the Adminis-

trator's request to hire a full-time Hospital pharmacist (R. 934–35, 1026–27, TX 25), and to create an entirely new position—Director of Patient Relations. (R. 933–34, 1032; TX 26).

Finally, at the hearing before the ALJ the Administrator testified without contradiction that he could not take the following actions without first obtaining the Trustees' approval: (1) raising room rates; (2) increasing Hospital staffing levels; (3) adding new insurance benefits; (4) increasing vacations, paid holidays or days off for Hospital staff; (5) bargaining with a union; or (6) signing or executing a collective-bargaining agreement. (R. 1043–44).

In sum, we conclude that the Board of Trustees is an exempt political subdivision within the meaning of § 2(2) of the Act. And, having examined both the agreements between the parties and their actual practices, we are convinced that the Trustees clearly retained such control over the employment relation that the Society could not engage in meaningful collective bargaining. Therefore we must hold the Board's finding that the Society continued to qualify as the sole employer of the Hospital's registered nurses is not supported by substantial evidence in the record as a whole, and that the Board erred in exercising jurisdiction.

---

24. We thus find the General Counsel's assertion that the Trustees' involvement here amounted to no more than "perfunctory approval of the Society—determined increases for registered nurses" (Board Brief at 34), to be without merit. Equally without merit is the General Counsel's suggestion that the maintenance of wage rate ranges with automatic semi-annual step increases indicates a lack of Trustee control over labor relations. (Board Brief at 33–34). Trustee Treasurer Soumas testified that when it had been necessary to increase the minimum wage level at each step, the Trustees specifically approved the increase by resolution. (R. 1006).

The significant participation of the Trustees is reflected in the minutes of the meeting which state:

The two administrators have reached a decision concerning salaries and *would like to raise the salaries* of R.N.'s to $800.00 per month and L.P.N.'s to $560.00 per month starting August 1st with plans to increase

salaries for nurse's aides etc. on January 1st. *They would like* to initiate a $3.00 room-rate increase starting September 1st. [Trustee] Jim Soumas felt that he didn't care to approve a room rate increase until [the Society] sets up an accounting system where one hospital showing a monthly profit subsidizes the other. A letter was written January 12, 1976, concerning this matter indicating something would be done concerning it by [the Society], but nothing has. Dave Brown will follow up on this matter. Motion was made and seconded to raise the room rates $3.00 per day beginning September 1st. Motion carried with one dissenting vote by Jim Soumas. Motion was made and seconded to increase the salaries for R.N. and L.P.N. employees as indicated. Motion carried.
(TX 26) (Emphasis added).

The revenues derived from the room charges were the only source of funds for the salaries paid at the Hospital. (R. 913, 933).

Moreover for the same reasons—reasons showing the control of the employment relation by the Trustees—we must also agree that the Trustees are in effect at least a joint employer, demonstrating further the error of the Board in exercising jurisdiction in these circumstances. *NLRB v. Chicago Youth Centers*, 616 F.2d 1028 (7th Cir.); *Lutheran Welfare Services of Illinois v. NLRB*, 607 F.2d 777, 778 (7th Cir.); *Ohio Inns, Inc., supra*, 205 NLRB at 528–29; *ARA Services, Inc.*, 221 NLRB No. 16 at 65–66; *see also Jackson County Public Hos-pital v. Public Employment Relations Board*, 280 N.W.2d 426 (Iowa).

Accordingly, the petition to review the Board's order is granted, the order is set aside, and its enforcement is denied.